IN RE APPLICATION OF COLUMBUS SOUTHERN POWER COMPANY ET AL.;
OFFICE OF THE OHIO CONSUMERS' COUNSEL ET AL., APPELLANTS; PUBLIC
UTILITIES COMMISSION ET AL., APPELLEES.

[Cite as *In re Application of Columbus S. Power Co.,* 128 Ohio St.3d 512,
2011-Ohio-1788.]

*Public Utilities Commission — S.B. 221 — Retroactive ratemaking, including
rate-increase refunds, is contrary to law — Provider-of-last-resort costs
not supported by evidence — R.C. 4928.143(B)(2) does not permit electric
security plans to include unlisted items for cost recovery — Commission
order otherwise affirmed and cause remanded.*

No. 2009-2022 — Submitted February 2, 2011 — Decided April 19, 2011.)

APPEAL from the Public Utilities Commission, Nos. 08-917-EL-SSO
and 08-918-EL-SSO.

_____

**LUNDBERG STRATTON, J.**

**{¶ 1}** This appeal stems from a major proceeding in which the Ohio
Public Utilities Commission authorized new generation rates for the American
Electric Power operating companies ("AEP") Columbus Southern Power
Company and Ohio Power Company. The appellants, the Office of the Ohio
Consumers' Counsel ("OCC") and Industrial Energy Users-Ohio ("IEU"), raise
13 propositions of law. We hold that the commission committed reversible error
on three grounds, affirm on all other issues, and remand the order to the
commission for further proceedings.

**I. Factual Background**

**{¶ 2}** In 2008, the General Assembly enacted Senate Bill 221, 2008
Am.Sub.S.B. No. 221 ("S.B. 221"), which substantially revised the regulation of

electric service in Ohio. Before S.B. 221, there was Senate Bill 3. Adopted in 1999, Senate Bill 3, 148 Ohio Laws, Part IV, 7962, was designed "to facilitate and encourage development of competition in the retail electric market." *AK Steel Corp. v. Pub. Util. Comm.* (2002), 95 Ohio St.3d 81, 765 N.E.2d 862. Competition, however, "fail[ed] * * * to develop according to expectations." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 3.

{¶ 3} This failure followed a nationwide trend. Soon after several states passed deregulatory laws, "two tumultuous events—the crisis of electric power in California and the collapse of the world's largest electric trading corporation, Enron"—"cast something of a cloud over the deregulation movement, which had been almost the signature cause of the 1980s and 1990s." Cudahy, Whither Deregulation: A Look at the Portents (2001), 58 N.Y.U. Ann.Surv.Am.Law 155, 155. Beyond these particular crises, "the cost of generating power increased significantly, due primarily to increases in the costs of the underlying fuel sources." Van Nostrand, Constitutional Limitations on the Ability of States to Rehabilitate Their Failed Electric Utility Restructuring Plans (2008), 31 Seattle U.L. Rev. 593, 593–594. Several states experimenting with deregulation found, as did Ohio, that "the anticipated competition did not develop." Id. at 593.

{¶ 4} Faced with a lack of competition, rising electricity prices, and unpalatable market-based rates, the commission and utilities responded with various rate plans not expressly contemplated by statute. In reviewing these plans, we recognized the possibility that additional legislative action might be required. In *Ohio Consumers' Counsel*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 41, we observed, "[A]s we continue to see the rate-stabilization plans appealed from the commission, we presume that the commission is sharing its evaluations and reports on the effectiveness of competition with the legislature, * * * so that it can continue to evaluate the need for further legislative action."

{¶ 5} "[F]urther legislative action" arrived with S.B. 221. The bill addressed several areas of concern with electric markets. Pertinent here, it established new standards to govern generation rates. See R.C. 4928.141 through 4928.144. Broadly speaking, the new regulatory regime requires electric-distribution utilities to provide consumers with "a standard service offer of all competitive retail electric services necessary to maintain essential electric service to consumers, including a firm supply of electric generation service." R.C. 4928.141(A). The utility may provide the offer in one of two ways: through a "market rate offer" under R.C. 4928.142 or through an "electric security plan" under R.C. 4928.143. The market-rate offer, as the name implies, sets rates using a competitive-bidding process to harness market forces.

{¶ 6} AEP applied for the second option, an electric security plan ("ESP"). It filed its application on July 31, 2008, and multiple parties intervened. A hearing was held from November to December 2008, briefing was completed over the holidays, and on March 18, 2009, the commission issued a 77-page opinion and order modifying and approving the plan. Two rounds of rehearing applications followed, resolved by entries on July 23 and November 4. OCC and IEU appealed. AEP has intervened in support of the commission.

## II. Discussion

{¶ 7} The appellants have raised 13 propositions of law, which we have reduced to ten issues. We begin with the three issues in which the appellants have demonstrated error.

### A. OCC Propositions of Law 1, 2, and 3: The commission violated the law by granting a retroactive rate increase, but OCC is not entitled to a monetary refund

{¶ 8} In its first three propositions of law, OCC argues that the commission unlawfully granted AEP a $63 million retroactive rate increase, in violation of R.C. 4928.141(A), as well as the rule established in *Keco Industries,*

*Inc. v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 2 O.O.2d 85, 141 N.E.2d 465. We agree with OCC on the merits: the commission unlawfully granted a retroactive rate increase. For reasons discussed, however, OCC has not established that it is entitled to its requested remedy of a refund.

1. The commission unlawfully granted AEP a retroactive rate increase

{¶ 9} AEP had sought a rate increase effective January 2009, but the commission did not issue an order until mid-March. Thus, from January through March, AEP collected less revenue than it would have if the application had been approved before January 1. In response to this delay in rate relief, the commission set AEP's rates at a level "intended to permit the companies to recover 12 months of revenue over a 9-month period." The additional increase totaled $63 million.

{¶ 10} This was retroactive ratemaking. Although the commission did not authorize AEP to rebill customers for usage from January through March, it reached the same financial result by setting rates from April through December 2009 at a level sufficient to recover lost revenues from January through March. In AEP's words, "the Commission's decision * * * yield[s] a similar financial impact as would have occurred if a decision had been issued by December 28, 2008 * * *." By approving rates that recouped losses due to past regulatory delay, the commission violated this court's case law on retroactive ratemaking, as well as provisions of S.B. 221.

{¶ 11} A rate increase making up for revenues lost due to regulatory delay is precisely the action that we found contrary to law in *Keco*. "[A] utility may not charge increased rates during proceedings before the commission seeking same [,] and losses sustained thereby"—that is, while the case is pending—"may not be recouped." *Keco*, 166 Ohio St. at 259, 2 O.O.2d 85, 141 N.E.2d 465. Likewise, in *Lucas Cty. Commrs. v. Pub. Util. Comm.* (1997), 80 Ohio St.3d 344, 348, 686 N.E.2d 501, we ruled that "utility ratemaking * * * is prospective only" and that

R.C. Title 49 "prohibit[s] utilities from charging increased rates during the pendency of commission proceedings and appeals." Id. These cases make plain that present rates may not make up for dollars lost "during the pendency of commission proceedings." Id. That is exactly what occurred here.

{¶ 12} The appellees respond by arguing that *Keco*'s rule does not apply in proceedings under the new statutes of S.B. 221. We need not decide whether *Keco* continues to apply, as the ruling also violates a provision of S.B. 221 itself, under R.C. 4928.141(A). That section specifically prescribes the applicable rates if a new standard service offer has not been approved by January 1, 2009: preexisting rates "*shall* continue * * * until a standard service offer is first authorized under section * * * 4928.143." (Emphasis added.) R.C. 4928.141(A); see R.C. 4928.01(A)(33) (" 'Rate plan' means the standard service offer in effect on the effective date of the amendment of this section by S.B. 221 of the 127th general assembly, July 31, 2008").

{¶ 13} This section rules out retroactive rate increases. The requirement to continue existing rates is mandatory. Although the statute does not expressly prohibit a retroactive rate increase, the express remedy (to "continue" existing rates until new rates are approved) rules out nonexpress remedies (such as tracking and restoring the difference between old and new rates if approval is delayed). See, e.g., *Myers v. Toledo*, 110 Ohio St.3d 218, 2006-Ohio-4353, 852 N.E.2d 1176, ¶ 24 ("the express inclusion of one thing implies the exclusion of the other"). This statutory and case law concerning retroactive ratemaking spans nearly 50 years. Cf. *Clark v. Scarpelli* (2001), 91 Ohio St.3d 271, 278, 744 N.E.2d 719 ("It is presumed that the General Assembly is fully aware of any prior judicial interpretation of an existing statute when enacting an amendment").

{¶ 14} Thus, under either the case-law or under R.C. 4928.141(A), the commission violated the law when it granted AEP additional rates to make up for the regulatory delay.

2.  OCC did not avail itself of the remedy provided by law

**{¶ 15}** This conclusion leads to the more difficult question: What remedy is available for OCC?  The unlawful rate increase lasted until the end of 2009 and has been fully recovered, so reversing the retroactive increase will not reduce ongoing rates.  The rule against retroactive rates, however, also prohibits refunds.

**{¶ 16}** OCC argues that the commission should have made the entire rate increase subject to refund but cites no authority under which the commission could have done so.  As OCC recognizes, under *Keco*, we have consistently held that the law does not allow refunds in appeals from commission orders.  As we stated only two years ago, "any refund order would be contrary to our precedent declining to engage in retroactive ratemaking." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St.3d 362, 2009-Ohio-604, 904 N.E.2d 853, ¶ 21; see also, e.g., *Green Cove Resort I Owners' Assn. v. Pub. Util. Comm.*, 103 Ohio St.3d 125, 2004-Ohio-4774, 814 N.E.2d 829, ¶ 27 ("Neither the commission nor this court can order a refund of previously approved rates, however, based on the doctrine set forth in *Keco* * * *"); *Keco*, 166 Ohio St. 254, 2 O.O.2d 85, 141 N.E.2d 465, paragraph two of the syllabus  (R.C. Title 49 "affords no right of action for restitution of the increase in charges collected during the pendency of the appeal").  These precedents remain good law and still apply to these facts, thus prohibiting the granting of a refund.

**{¶ 17}** We recognize that the no-refund rule transforms OCC's win on the merits into a somewhat hollow victory.  Any apparent unfairness, however, remains a policy decision mandated by the larger legislative scheme.  As *Keco* and other cases have noted, the statutes protect against unlawfully high rates by allowing stays.  R.C. 4903.16 authorizes the court to stay execution of commission orders.  This section makes "clear that the General Assembly intended that a public utility shall collect the rates set by the commission's order, giving, however, to any person who feels aggrieved by such order a right to

secure a stay of the collection of the new rates after posting a bond." *Keco*, 166 Ohio St. at 257, 2 O.O.2d 85, 141 N.E.2d 465. The stay remedy "completely abrogated" the form of refund (a restitution order) sought in that case. Id. at 259.

{¶ 18} The difficulty for OCC is that to obtain such a stay, it must "execute an undertaking * * * conditioned for the prompt payment by the appellant of all damages caused by the delay in the enforcement of the order." R.C. 4903.16; see also *Office of Consumers' Counsel v. Pub. Util. Comm.* (1991), 61 Ohio St.3d 396, 403–404, 575 N.E.2d 157 (the bond requirement applies to OCC under "R.C. 4903.16, and this court's interpretation thereof"). OCC acted with diligence and speed to secure a financial remedy in this case: it filed an action in prohibition, a quick—and premature—appeal, an action for a writ of procedendo, and a motion to suspend the order in this case. Critically, however, OCC did not seek to post a bond—in fact, it affirmatively sought to avoid doing so.

{¶ 19} OCC concedes that it failed to post bond, but asserts that it is "not financially capable of posting any bond other than a nominal amount," a circumstance that makes "a stay * * * truly an illusory remedy at best unless the Court relieves OCC from filing a bond." To the degree that the bond requirement poses a barrier, however, it is one that must be cured by the General Assembly. Unquestionably, it is the prerogative of the General Assembly to establish the bounds and rules of public-utility regulation. See, e.g., *Akron v. Pub. Util. Comm.* (1948), 149 Ohio St. 347, 359, 78 N.E.2d 890 ("the legislative branch of the state government may confer upon" the commission "very broad [powers]" for the "supervision, regulation and, in a large measure, control of the operation of public utilities"). And our "revisory jurisdiction" over agency proceedings is limited to that "conferred by law." Section 2(d), Article IV, Ohio Constitution.

{¶ 20} The legislature has seen fit to attach a significant requirement to the court's stay power: the posting of a bond sufficient to protect the utility

against damage. R.C. 4903.16. If the General Assembly so desired, it could remove or loosen this condition on the stay power. It has not done so, despite decades of cases refusing to grant a refund. At bottom, then, the statutory scheme creates OCC's problem. We understand the difficulty a public agency such as OCC faces in dealing with the bond requirement. Nevertheless, the statute is clear, and it clearly applies. Whether it is wise to apply the bond requirement to OCC is a matter for the General Assembly to consider, not this court.

{¶ 21} For these reasons, we hold that the commission's decision to authorize a retroactive rate increase was unlawful, but we deny OCC's refund request.

B. *IEU Proposition of Law 3; OCC 5: In approving a provider-of-last-resort charge, the commission relied on a justification lacking any record support.*

{¶ 22} The commission approved the recovery of roughly $500 million in provider-of-last-resort ("POLR") charges over the three years of the plan. OCC and IEU attack the charge on several grounds, including that the commission lacked record support.

{¶ 23} Under Ohio law, customers may purchase generation service from a competitive supplier. If such a supplier fails to provide service, "the supplier's customers * * * default[] to the utility's standard service offer * * * until the customer chooses an alternative supplier." R.C. 4928.14. This obligation to stand ready to accept returning customers makes the utility the "provider of last resort," or "POLR." See, e.g., *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 39, fn. 5 ("POLR costs are those costs incurred by [the utility] for risks associated with its legal obligation as the default provider, or electricity provider, of last resort, for customers who shop and then return to [the utility] for generation service"). In other reviews of POLR charges, we have admonished the commission to "carefully consider what costs it

is attributing" to "POLR obligations." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 26.

{¶ 24} Below, the commission approved a POLR charge totaling over $500 million over the term of the ESP. It described the charge as *cost*-based. "[T]he POLR rider will be based on *the cost* to the Companies to be the POLR and carry the risks associated therewith * * *." (Emphasis added.) Likewise, it stated that it was allowing recovery of "estimated POLR *costs.*" (Emphasis added.) Again on rehearing, the commission stated that it had "determined that the Companies should be compensated for the *cost* of carrying the risk associated with being the POLR provider." (Emphasis added.) This characterization of the POLR charge as cost-based lacks any record support; therefore, we reverse the portion of the order approving the POLR charge.

{¶ 25} We have carefully reviewed the record, and we can find no evidence suggesting that AEP's POLR charge is related to any costs it will incur. AEP derived its charge using a mathematical formula created to price exchange-traded options. The company analogized an option to buy and sell securities to the statutory right to shop for power, changed some variables, and applied the formula. This formula, called "the Black-Scholes model" after two of its creators, is the only evidence AEP presented in support of its POLR charge.

{¶ 26} Contrary to the order, this formula simply does not reveal "the cost to the Companies to be the POLR and carry the risks associated therewith." The record shows that the model does not even purport to estimate costs, but instead tries to quantify "the value of the optionality [to shop for power] that is provided to customers under Senate Bill 221." Value to customers (what the model shows) and cost to AEP (the purported basis of the order) are simply not the same thing. AEP's own witness made this clear—"[t]rying to recover the *costs of the Companies' POLR obligation* retrospectively would fail, because it ignores the very nature of the POLR obligation. The *value of the customers' right to switch*

under S.B. 221 comes from the option customers are given to switch suppliers, while still having the safety net of the ESP rate * * *." (Emphases added.)

{¶ 27} Even assuming that AEP accurately priced the option, we fail to see how the amount a customer would be willing to pay for the right to shop necessarily establishes AEP's costs to bear the attendant risks. The order does not explain the relationship between the two. And witnesses for other parties confirmed that the POLR charge was not based on cost. A witness for OCC testified that AEP has "not identified any specific costs they are incurring related to the POLR obligation." Another witness agreed that AEP does "not appear to have an actual out of pocket expense." Along similar lines, a member of the commission's staff stated that "a POLR charge, if one is considered appropriate, would be significantly below what AEP is requesting."

{¶ 28} Other facts in the record further call into question the accuracy of AEP's POLR theory. The record showed that AEP has had "virtually no" shopping in the last eight years, including no residential shoppers. No countervailing evidence predicted an uptick in shopping. No witness testified that more switching could be expected in the future, and AEP performed no "actual customer surveys" or "studies apart from the Black-Scholes model" to determine whether shopping was likely to increase. On the contrary, the commission's own economist testified that "there are many reasons to think that substantial migration will not quickly occur, even if the market price falls below the SSO [standard service offer] price." Even AEP's witness testified that "[d]esire to switch, in [his] view, will be when there's an economic advantage," but that "today," there is "no economic advantage." Accordingly, AEP did not even "have a plan to purchase" options to hedge its own POLR risk. At the very least, all this evidence raises doubts about the proposition that AEP would justifiably expend $500 million to bear the POLR risk.

{¶ 29} In short, the manifest weight of the evidence contradicts the commission's conclusion that the POLR charge is based on cost. In contrast with our recent admonition that the commission must "carefully consider what costs it is attributing" to "POLR obligations," *Ohio Consumers' Counsel*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 26, no evidence supports the commission's characterization of this charge as based on cost. Ruling on an issue without record support is an abuse of discretion and reversible error. See, e.g., *Indus. Energy Users-Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30. Therefore, we reverse the provisions of the order authorizing the POLR charge.

{¶ 30} On remand, the commission may revisit this issue. To be clear, we express no opinion on whether a formula-based POLR charge is per se unreasonable or unlawful, and the commission may consider on remand whether a non-cost-based POLR charge is reasonable and lawful. Alternatively, the commission may consider whether it is appropriate to allow AEP to present evidence of its actual POLR costs. However the commission chooses to proceed, it should explain its rationale, respond to contrary positions, and support its decision with appropriate evidence.

### C. OCC Proposition of Law 6: The commission erred in determining that ESPs may include items not specifically authorized by statute

{¶ 31} In its sixth proposition of law, OCC argues that R.C. 4928.143(B)(2) does not permit AEP to recover certain carrying costs associated with environmental investments. That section states, "The [electric security] plan may provide for or include, without limitation, any of the following," and then lists nine categories of cost recovery. OCC argues that this section permits plans to include *only listed* items; the commission and AEP argue that (B)(2) permits *unlisted* items. We agree with OCC.

**{¶ 32}** By its terms, R.C. 4928.143(B)(2) allows plans to include only "any of the following" provisions. It does not allow plans to include "any provision." So if a given provision does not fit within one of the categories listed "following" (B)(2), it is not authorized by statute.

**{¶ 33}** The commission believes that the phrase "without limitation" allows unlisted items, asserting that the nine categories are "illustrative, * * * not exhaustive." But this phrase does not allow unlisted items. Rather, it allows unlimited inclusion of listed items. The list limits *the type* of categories a plan may include, while the phrase "without limitation" allows *as many or as much* of the listed categories as the commission finds reasonable—subject to any other applicable limits, which we do not consider here.

**{¶ 34}** The plain language of the statute controls, and this interpretation leads to a reasonable result. However, the appellees' interpretation would remove any substantive limit to what an electric security plan may contain, a result we do not believe the General Assembly intended.

**{¶ 35}** For the foregoing reasons, we reverse the commission's legal determination that R.C. 4928.143(B)(2) permits ESPs to include unlisted items. On remand, the commission may determine whether any of the listed categories of (B)(2) authorize recovery of environmental carrying charges.

*D. IEU Proposition of Law 1: The commission did not lose jurisdiction over the case when the 150-day approval deadline expired*

**{¶ 36}** In its first proposition of law, IEU argues that the commission "lost jurisdiction over AEP-Ohio's July 31, 2008 ESP Application when it failed to authorize an ESP within the 150-day time frame required by R.C. 4928.143." We disagree.

**{¶ 37}** " 'As a general rule, a statute which provides a time for the performance of an official duty will be construed as directory so far as time for performance is concerned, especially where the statute fixes the time simply for

convenience or orderly procedure.' " *In re Davis* (1999), 84 Ohio St.3d 520, 522, 705 N.E.2d 1219, quoting *State ex rel. Jones v. Farrar* (1946), 146 Ohio St. 467, 471–472, 32 O.O. 542, 66 N.E.2d 531. "This is so 'unless the nature of the act to be performed or the phraseology of the statute or of other statutes relating to the same subject-matter is such that the designation of time must be considered a limitation upon the power of the officer.' " Id., quoting *State ex rel. Smith v. Barnell* (1924), 109 Ohio St. 246, 255, 142 N.E. 611.

{¶ 38} Under this principle, deadlines concerned with "the prompt conduct of the public business" should be considered "directory," not mandatory. *Jones* at 472. The use of the word "shall" to institute the deadline does not change this. See *Davis* at 522 ("even with 'shall' as the operative verb, a statutory time provision may be directory"). And a deadline provision that does not "mandate any particular result if the * * * decision is untimely" further supports a directory interpretation. *State ex rel. Larkins v. Wilkinson* (1997), 79 Ohio St.3d 477, 479, 683 N.E.2d 1139; see also, e.g., *Davis* at 522 (a deadline was directory where it did "not include any expression of intent to restrict the jurisdiction of the court for untimeliness").

{¶ 39} Applying these standards, we hold that R.C. 4928.143(C)(1)'s 150-day deadline is directory and that the commission retained jurisdiction over the case when the deadline expired.

{¶ 40} R.C. 4928.143(C)(1) provides: "The commission shall issue an order under this division for an initial application under this section not later than one hundred fifty days after the application's filing date and, for any subsequent application by the utility under this section, not later than two hundred seventy-five days after the application's filing date."

{¶ 41} Considering the act as a whole, we find it plain that the General Assembly enacted the 150-day deadline to ensure prompt review of initial ESP applications. To begin with, that is how we generally interpret such provisions, *In*

*re Davis*, 84 Ohio St.3d at 522, 705 N.E.2d 1219, and numerous provisions of S.B. 221 confirm that the general rule applies here. For example, the introductory section of S.B. 221 requires electric distribution utilities to provide a standard service offer by a specific date, January 1, 2009. R.C. 4928.141(A). Given that the law took effect July 31, 2008, the utilities and the commission had not quite six months to have new rates put into effect. Six months is a comparatively short amount of time for a major rate proceeding; the commission is given almost twice as much time (275 days) to resolve a distribution-rate proceeding, see R.C. 4909.42, and later ESP proceedings. See R.C. 4928.143(C)(1). Moreover, the statute expressly permits utilities to file their applications "prior to the effective date of any rules the commission may adopt for the purpose of this section." R.C. 4928.143(A).

{¶ 42} All this suggests that the General Assembly meant to hasten the filing and review of initial ESPs, not set a jurisdictional bar. IEU points to no factors that suggest the opposite. For example, R.C. 4928.143 does not impose any consequence for exceeding the 150-day deadline. It does not mandate dismissal and refiling. Notably, this consequence is required in other scenarios, but not for expiration of the 150-day deadline. See R.C. 4928.143(C)(2)(a) and (b).

{¶ 43} R.C. 4928.143(C)(1)'s deadline effectuates "the proper, orderly, and prompt" resolution of initial ESP applications. *Jones*, 146 Ohio St. at 472, 32 O.O. 542, 66 N.E.2d 531. The deadline is not jurisdictional, and we reject IEU's first proposition of law.

### E. IEU Proposition of Law 2: IEU has not shown error in AEP's acceptance and appeal of its ESP

{¶ 44} In its second proposition of law, IEU argues that the commission should have "prohibit[ed] AEP-Ohio from accepting the benefits of the higher

14

rates approved in the ESP while simultaneously preserving the right to withdraw and terminate the approved ESP." This argument lacks merit.

{¶ 45} Under R.C. 4928.143(C)(1), the commission must do one of three things when an ESP is filed: it must "approve," "modify and approve," or "disapprove" the application. "If the commission modifies and approves an application," the utility "may withdraw the application, thereby terminating it, and may file a new standard service offer." R.C. 4928.143(C)(2)(a).

{¶ 46} In this case, the commission modified and approved the ESP. AEP filed tariffs instituting the new rates but stated in its cover letter, "The Companies do not waive * * * their right under § 4928.143(C)(2), Ohio Rev. Code, regarding withdrawal of their Application." According to IEU, AEP "has never formally accepted its approved ESP, is still taking the benefits of the ESP, and has filed an appeal of its ESP to this Court." IEU contends that a utility "cannot accept the benefits of the rates approved in an ESP while simultaneously preserving the right to withdraw and terminate the ESP."

{¶ 47} IEU has not met its burden of showing error. The law permits utilities to withdraw modified ESPs, but does not require it, R.C. 4928.143(C)(2)(a), and IEU cites no authority requiring "formal acceptance" of an ESP. The fact that AEP has neither withdrawn nor formally accepted its application does not show error.

{¶ 48} We will not weigh in on whether AEP could collect ESP rates for some period of time and then withdraw the plan. AEP has not done so, and we do not address hypothetical questions. See *State ex rel. Elyria Foundry Co. v. Indus. Comm.* (1998), 82 Ohio St.3d 88, 89, 694 N.E.2d 459; *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 17.

{¶ 49} IEU has failed to demonstrate legal error, and we reject its second proposition of law.

*F.   OCC Proposition of Law 4:   The commission adequately*

*explained why it was not following prior decisions in allowing*

*AEP to keep the proceeds of "off-system sales"*

{¶ 50} In its fourth proposition of law, OCC argues that the order departed from precedent without sufficient explanation.  The commission allowed AEP to keep all proceeds from "off-system sales," meaning unregulated sales to other resellers and not to retail customers, rather than requiring AEP to give the net profits of those sales as a rate credit to consumers.  OCC asserts that in past cases, the commission required utilities to share with customers the revenue from such sales.   According to OCC, the commission has departed from this precedent without sufficient explanation.

{¶ 51} At the outset, we note that OCC does *not* argue that the underlying decision was *substantively* unlawful and unreasonable.  In fact, OCC concedes that the law "does not require profits from off-system sales to be included in the ESP rates"—that is,   shared with customers.   Its argument is procedural and limited to whether the commission "failed to explain why it was departing from precedent."

{¶ 52} It is true that we have instructed the commission to "respect its own precedents in its decisions to assure the predictability which is essential in all areas of the law, including administrative law."  *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1975), 42 Ohio St.2d 403, 431, 71 O.O.2d 393, 330 N.E.2d 1, superseded on other grounds by statute as recognized in *Babbit v. Pub. Util. Comm.* (1979), 59 Ohio St.2d 81, 89, 13 O.O.3d 67, 391 N.E.2d 1376.  This does not mean that the commission may never revisit a particular decision, only that if it does change course, it must explain why.  See, e.g., *Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 18; *Office of Consumers' Counsel v. Pub. Util. Comm.* (1985), 16 Ohio St.3d 21, 21– 22, 16 OBR 371, 475 N.E.2d 786 ("A few simple sentences in the commission's

order in this case would have sufficed" to explain why a previous order had been overruled). The new course also must be substantively reasonable and lawful, but OCC, as noted, has not placed that at issue here.

{¶ 53} Here, the commission explained why it did not follow the cases cited by OCC as precedent. None of them arose under the applicable body of law, S.B. 221. And the commission further concluded that the applicable law now in place does not even require OCC's requested treatment, a point that OCC concedes.

{¶ 54} The commission adequately explained why it did not follow the cases cited by OCC. As this is the only basis on which OCC attacks the commission's treatment of off-system sales, we reject its fourth proposition of law.

### G. IEU Proposition of Law 4: IEU fails to show error concerning the approval of charges related to a pair of generation stations

{¶ 55} In its fourth proposition of law, IEU argued that the commission should not have allowed recovery of charges associated with a pair of generation stations. According to IEU, the commission "cannot use traditional *cost-based ratemaking* selectively to increase rates where it believes particular categories of *competitive generation* costs are not currently reflected in rates." (Emphases sic.)

{¶ 56} " '[A] party who contends' " that rates and charges are unreasonable " 'has the burden on appeal to the Supreme Court under Section 4903.13, Revised Code, of showing that they are unjust, unreasonable or unlawful.' " *AT & T Communications of Ohio, Inc. v. Pub. Util. Comm.* (1990), 51 Ohio St.3d 150, 154, 555 N.E.2d 288, quoting *Columbus v. Pub. Util. Comm.* (1959), 170 Ohio St. 105, 10 O.O.2d 4, 163 N.E.2d 167, paragraph two of the syllabus. IEU fails to carry its burden here. At no point does appellant even purport to cite a specific legal authority that prohibits cost-based rates in an ESP. Several times, it asserts that S.B. 221 prohibits the commission's action. S.B.

221, however, is over 50 pages long, so this general citation does not provide enough guidance.

{¶ 57} Conclusory assertions that the commission cannot do something fall well short of demonstrating reversible error. IEU's argument in its fourth proposition is inadequately developed, and we reject it on that basis.

*H.  IEU Proposition of Law 5:  IEU fails to show error in the approval of*

*AEP's vegetation-management and smart-grid programs.*

{¶ 58} In its fifth proposition of law, IEU challenges the commission's approval of parts of AEP's proposed enhanced-vegetation-management[1] and smart-grid programs. Neither challenge succeeds.

{¶ 59} Regarding the vegetation-management program, IEU faults the commission for inconsistency—it approved this distribution charge but not others that had been requested. AEP had proposed four types of charges related to distribution service. The commission decided not to address three of the four, finding it better to examine those charges in "a distribution rate case where all components of distribution rates are subject to review." Nevertheless, it allowed recovery of an "enhanced vegetation initiative," based on its findings that "a specific need exists" for the initiative and that the charges were necessary to expand the current program.

{¶ 60} IEU asserts that this decision to approve some but not all distribution charges was unexplained. That is not true. The commission did explain why it considered one distribution program but not the others—"AEP-Ohio has demonstrated in the record of this proceeding that it faces increased costs for vegetation management and that a specific need exists for the implementation of the enhanced vegetation initiative * * *." IEU does not explain

---

1.  "Vegetation management" refers to trimming trees, clearing rights-of-way, and other activities necessary to keep wires clear.  See generally *Corrigan v. Illum. Co.*, 122 Ohio St.3d 265, 2009-Ohio-2524, 910 N.E.2d 1009, ¶ 15.

in any further detail *what else* the commission should have explained, so this portion of its argument is settled.

{¶ 61} In the other part of its fifth proposition, IEU argues that the commission approved AEP's "gridSMART" proposal "without any showing that [it] satisfied the cost-effectiveness requirements of R.C. 4928.02(D)." The provision cited by IEU states that "it is the policy of the state" to "[e]ncourage innovation and market access for cost-effective supply- and demand-side retail electric service including, but not limited to, demand-side management, time-differentiated pricing, and implementation of advanced metering infrastructure." IEU has not demonstrated legal error.

{¶ 62} To begin with, and contrary to IEU's assumption, R.C. 4928.02(D) does not impose strict "cost-effectiveness requirements" on any given program—indeed, by its terms, it does not *require* anything. It simply expresses state policy. As we have held, such policy statements are "guideline[s] for the commission to weigh" in evaluating utility proposals to further state policy goals, and it has been "left * * * to the commission to determine how best to carry [them] out." *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 125 Ohio St.3d 57, 2010-Ohio-134, 926 N.E.2d 261, ¶ 39–40. The commission plainly weighed this policy consideration in reviewing the programs. That alone is grounds to reject IEU's argument.

{¶ 63} In any event, the commission acted in step with the policy of R.C. 4928.02(D). By approving the initiation of the smart-grid program, the commission "[e]ncourage[d] innovation and market access" for "supply- and demand-side retail electric services," specifically including "implementation of advanced metering infrastructure." R.C. 4928.02(D). As to cost-effectiveness, the commission imposed several requirements to ensure prudent spending: "separate accounting for gridSMART, an opportunity to approve and update the plan each year, assurance that expenditures are made before cost recovery occurs,

and an opportunity to audit expenditures prior to recovery." Moreover, the commission cut in half the proposed cost-recovery and required AEP to seek federal stimulus funding. These provisions reduced costs and imposed mechanisms to protect consumers from unwarranted spending.

{¶ 64} For the foregoing reasons, we reject IEU's fifth proposition of law.

*I. IEU Proposition of Law 6: IEU has not demonstrated error in the commission's setting of AEP's fuel-cost baseline*

{¶ 65} ESPs may provide for "[a]utomatic recovery" of "the cost of fuel used to generate the electricity supplied under the offer," "provided the cost is prudently incurred." R.C. 4928.143(B)(2)(a). In its sixth proposition of law, IEU asserts that the commission violated the prudently-incurred-cost requirement when it used certain estimated fuel-cost figures in establishing AEP's base rate. This argument lacks merit.

{¶ 66} We note up front that IEU does not attack the use of an estimate *per se*, but merely the commission's *choice* of what estimate to use. IEU, AEP, and the commission's staff each proposed fuel-cost estimates; the commission adopted staff's. And we further note, because the record confirms, that no matter which estimate was used, only actual costs were to be recovered.

{¶ 67} IEU argues that the commission's choice of estimate violates R.C. 4928.143(B)(2)(a). That section authorizes "[a]utomatic recovery" of "the cost of fuel" "provided the cost is prudently incurred." The commission complied with this section. As noted above, only actual costs will be recovered, and as the commission stated in its order, they will be subject to prudence review ("the FAC [fuel adjustment clause] mechanism includes a quarterly reconciliation to actual FAC costs incurred," and the staff recommendation was adopted for "an annual prudency and accounting review" of the FAC).

{¶ 68} Moreover, IEU points to no legal authority that speaks to how the commission should determine or estimate fuel-cost baselines. Any lack of

statutory guidance on that point should be read as a grant of discretion.  See, e.g., *Payphone Assn. v. Pub. Util. Comm.*, 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, ¶ 25 ("When a statute does not prescribe a particular formula, the PUCO is vested with broad discretion").  IEU simply has not shown an abuse of discretion.  It asserts that the commission's estimate has the effect of "pushing too much money associated with the FAC into the deferral bucket."  But while IEU explains why it does not like that decision, it neither cites legal authority prohibiting the commission's approach nor persuasively explains how the order was objectively unreasonable.  That is not enough to demonstrate reversible error.

{¶ 69} We reject IEU's sixth proposition of law.

*J.  IEU Proposition of Law 7:  IEU fails to demonstrate any violation*
*of R.C. 4903.09's requirement of a reasoned explanation.*

{¶ 70} Last, in its seventh proposition of law, IEU alleges that the commission violated R.C. 4903.09 by failing to sufficiently detail "the reasons prompting the  decisions arrived at."  R.C. 4903.09.  IEU lodges this objection at a fatally high level of generality.   Had the commission issued a one-page summary order to resolve this case, it might suffice to assert simply that "the Orders omit the required documentation of the Commission's reasoning."  But the order and entries on rehearing fill 140 pages—while we do not equate breadth with depth, IEU must do more to show error.

{¶ 71} Given the rehearing requirements, IEU needs to show at least three things to prevail under R.C. 4903.09: first, that the commission initially failed to explain a material matter; second, that IEU brought that failure to the commission's attention through an application for rehearing; and third, that the commission still failed to explain itself.  IEU's nonspecific allegations establish none of these points.  (The only example developed by IEU concerns the POLR charge, which we have already discussed.)

**{¶ 72}** IEU has not specifically explained how the commission failed to explain itself. On that basis, we reject its seventh proposition of law.

### III. Conclusion

**{¶ 73}** Some of the issues raised are best left to the General Assembly, which has the responsibility to monitor the development and implementation of the new regulatory regime. We can resolve legal disputes, but we cannot fill gaps. While our goal is always to determine the intent of the General Assembly, we also recognize that our decisions may reveal gaps unintended by that body. If that occurs, or the law otherwise fails to achieve its policy objectives, the legislature is the appropriate body to determine those issues.

**{¶ 74}** For the foregoing reasons, we reverse in part, affirm in part, and remand this case to the commission.

Order affirmed in part

and reversed in part,

and cause remanded.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Janine L. Migden-Ostrander, Consumers' Counsel, and Terry L. Etter, Maureen R. Grady, and Richard C. Reese, Assistant Consumers' Counsel, for appellant Ohio Consumers' Counsel.

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Joseph E. Oliker, and Frank P. Darr, for appellant Industrial Energy Users-Ohio.

Michael DeWine, Attorney General, and William L. Wright, Werner L. Margard III, Thomas G. Lindgren, and John H. Jones, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Porter, Wright, Morris & Arthur, L.L.P., and Daniel R. Conway; and Steven T. Nourse and Matthew J. Satterwhite, for intervening appellees, Columbus Southern Power Company and Ohio Power Company.

————————————