O’Connor, C.J.,
concurring in part and dissenting in part.
{¶ 71} I believe that the majority prematurely reaches its conclusions that the commission’s order violates R.C. 4928.38 and that AEP is recovering the equivalent of unlawful transition revenue through the Retail Stability Rider (“RSR”). I thus dissent in part.
Analysis
{¶ 72} R.C. Chapter 4928 is a labyrinthian scheme that governs Ohio’s retail electric service, i.e., “any service involved in supplying or arranging for the supply of electricity to ultimate consumers in this state, from the point of generation to the point of consumption.” R.C. 4928.01(27). Among its provisions are those permitting and forbidding the recovery of transition costs. First-Energy Corp. v. Pub. Util. Comm., 95 Ohio St.3d 401, 2002-Ohio-2430, 768 N.E.2d 648, ¶ 14; R.C. 4928.37; R.C. 4928.39; R.C. 4928.141(A).
{¶ 73} In the proceedings below, the commission found that R.C. 4928.143(B)(2)(d) permitted American Electric Power (“AEP”) to include the RSR as part of its electric security plan (“ESP”). Pub. Util. Comm. Nos. 11-346-EL-SSO, 11-348-EL-SSO, 11-349-EL-AAM, and 11-350-EL-AAM, 31-32 (Aug. 8, 2012) (the “ESP Order”). The practical effect of that decision was that AEP collected over $500,000,000 in additional revenue through the RSR, which *458 AEP had designed, in part, to recover lost revenue from competitive retail-electric-service providers.
{¶ 74} Appellant the Office of the Ohio Consumers’ Counsel contends that the commission acted improperly in allowing AEP to collect the revenue because the statutory period set by the General Assembly for the recovery of transition costs had ended. See R.C. 4928.37(A)(1), 4928.38, and 4928.40(A). The majority agrees and reverses the approval of the RSR on the basis that AEP is recovering the equivalent of unlawful transition revenue through the rider in violation of R.C. 4928.38. But in doing so, the majority ignores what could be significant language in the ESP statute, R.C. 4928.143(B), by relegating that language to a footnote and then ignoring it. Majority opinion at fn. 3.
{¶ 75} R.C. 4928.143(B) contains broadly worded language that states “[notwithstanding any other provision” in R.C. Title 49 “to the contrary,” except the provisions in “division (D) of this section, divisions (I), (J), and (K) of section 4928.20, division (E) of section 4928.64, and section 4928.69 of the Revised Code,” an ESP may provide or include, without limitation, a host of costs the utility incurs in providing electric service.[5]
*459 {¶ 76} The provision could be construed to allow an ESP to include charges that other provisions of R.C. Title 49 prohibit. Here, even assuming that the *460 majority is correct that R.C. 4928.38 bars the recovery of transition revenue, R.C. 4928.143(B) nevertheless could be read to create an exception to the prohibition on transition revenue as long as the revenues are recoverable under the requirements of R.C. 4928.143(B)(2). Stated differently, the word “notwithstanding” could render R.C. 4928.38 inapplicable if the revenues are recoverable under one of the many provisions of R.C. 4928.143(B)(2).
{¶ 77} I recognize that the commission did not rely on the “notwithstanding” provision of R.C. 4928.143(B) in the proceedings below. And although it appears that no party has squarely raised the issue to this court, two parties, FirstEnergy Solutions and IEU, cited the “notwithstanding” provision of R.C. 4928.143(B) before the commission in relation to another rider (the Generation Resource Rider). ESP Order at 21. In that context, the parties’ interpretation of the provision suggests that the “notwithstanding” clause could be read broadly as an exception. The commission, however, decided the question on other grounds and never addressed the “notwithstanding” argument, see ESP Order at 19-25, and I am unaware of any case in which the commission has considered or clarified the particular language of R.C. 4928.143(B).
{¶ 78} We could decide the meaning of the provision in the first instance. But we can, and should, consider the expertise of a state agency in interpreting a law where, as here, there are “highly specialized issues” involved and where “agency expertise” would be “of assistance in discerning the presumed intent of our General Assembly.” Consumers’ Counsel v. Pub. Util. Comm., 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).
{¶ 79} Given that the “notwithstanding” provision could create an exception to the prohibition against the recovery of transition revenue and that the commission has offered no guidance on the meaning of that provision, I would remand the cause to the commission to consider and interpret the statutory language before rendering a decision on whether AEP is improperly recovering transition costs. See, e.g., In re Application of Columbus S. Power Co., 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 31-35. By doing so, we would not only respect the role of the General Assembly to create the framework by which utilities must provide service to the millions of Ohio consumers who rely on safe, affordable electrical service, but also the collective expertise of the commission in a complex area of law that implicates important public-health and financial-policy considerations.
LaNZINGER, J., concurs in the foregoing opinion.

. R.C. 4928.143(B) provides:
Notwithstanding any other provision of Title XLIX of the Revised Code to the contrary except division (D) of this section, divisions (I), (J), and (K) of section 4928.20, division (E) of section 4928.64, and section 4928.69 of the Revised Code:
(1) An electric security plan shall include provisions relating to the supply and pricing of electric generation service. * * *
(2) The plan may provide for or include, without limitation, any of the following:
(a) Automatic recovery of any of the following costs of the electric distribution utility, provided the cost is prudently incurred: the cost of fuel used to generate the electricity supplied under the offer; the cost of purchased power supplied under the offer, including the cost of energy and capacity, and including purchased power acquired from an affiliate; the cost of emission allowances; and the cost of federally mandated carbon or energy taxes;
(b) A reasonable allowance for construction work in progress for any of the electric distribution utility’s cost of constructing an electric generating facility or for an environmental expenditure for any electric generating facility of the electric distribution utility, provided the cost is incurred or the expenditure occurs on or after January 1, 2009. Any such allowance shall be subject to the construction work in progress allowance limitations of division (A) of section 4909.15 of the Revised Code, except that the commission may authorize such an allowance upon the incurrence of the cost or occurrence of the expenditure. No such allowance for generating facility construction shall be authorized, however, unless the commission first determines in the proceeding that there is need for the facility based on resource planning projections submitted by the electric distribution utility. Further, no such allowance shall be authorized unless the facility’s construction was sourced through a competitive bid process, regarding which process the commission may adopt rules. An allowance approved under division (B)(2)(b) of this section shall be established as a nonbypassable surcharge for the life of the facility.
*459 (c) The establishment of a nonbypassable surcharge for the life of an electric generating facility that is owned or operated by the electric distribution utility, was sourced through a competitive bid process subject to any such rules as the commission adopts under division (B)(2)(b) of this section, and is newly used and useful on or after January 1, 2009, which surcharge shall cover all costs of the utility specified in the application, excluding costs recovered through a surcharge under division (B)(2)(b) of this section. However, no surcharge shall be authorized unless the commission first determines in the proceeding that there is need for the facility based on resource planning projections submitted by the electric distribution utility. Additionally, if a surcharge is authorized for a facility pursuant to plan approval under division (C) of this section and as a condition of the continuation of the surcharge, the electric distribution utility shall dedicate to Ohio consumers the capacity and energy and the rate associated with the cost of that facility. Before the commission authorizes any surcharge pursuant to this division, it may consider, as applicable, the effects of any decommissioning, deratings, and retirements.
(d) Terms, conditions, or charges relating to limitations on customer shopping for retail electric generation service, bypassability, standby, back-up, or supplemental power service, default service, carrying costs, amortization periods, and accounting or deferrals, including future recovery of such deferrals, as would have the effect of stabilizing or providing certainty regarding retail electric service;
(e) Automatic increases or decreases in any component of the standard service offer price;
(f) Consistent with sections 4928.23 to 4928.2318 of the Revised Code, both of the following:
(i) Provisions for the electric distribution utility to securitize any phase-in, inclusive of carrying charges, of the utility’s standard service offer price, which phase-in is authorized in accordance with section 4928.144 of the Revised Code;
(ii) Provisions for the recovery of the utility’s cost of securitization.
(g) Provisions relating to transmission, ancillary, congestion, or any related service required for the standard service offer, including provisions for the recovery of any cost of such service that the electric distribution utility incurs on or after that date pursuant to the standard service offer;
(h) Provisions regarding the utility’s distribution service, including, without limitation and notwithstanding any provision of Title XLIX of the Revised Code to the contrary, provisions regarding single issue ratemaking, a revenue decoupling mechanism or any other incentive ratemaking, and provisions regarding distribution infrastructure and modernization incentives for the electric distribution utility. The latter may include a long-term energy delivery infrastructure modernization plan for that utility or any plan providing for the utility’s recovery of costs, including lost revenue, shared savings, and avoided costs, and a just and reasonable rate of return on such infrastructure modernization. As part of its determination as to whether to allow in an electric distribution utility’s electric security plan inclusion of any provision described in division (B)(2)(h) of this section, the commission shall examine the reliability of the electric distribution utility’s distribution system and ensure that customers’ and the electric distribution utility’s expectations are aligned and that the electric distribution utility is placing sufficient emphasis on and dedicating sufficient resources to the reliability of its distribution system.
(i) Provisions under which the electric distribution utility may implement economic development, job retention, and energy efficiency programs, which provisions may allocate program costs across all classes of customers of the utility and those of electric distribution utilities in the same holding company system.
(Emphasis added.)