[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.,* Slip Opinion No. 2014-Ohio-3764.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-3764

IN RE FUEL ADJUSTMENT CLAUSES FOR COLUMBUS SOUTHERN POWER

COMPANY AND OHIO POWER COMPANY;

OHIO POWER COMPANY, APPELLANT AND CROSS-APPELLEE;

INDUSTRIAL ENERGY USERS-OHIO, APPELLEE AND CROSS-APPELLANT;

PUBLIC UTILITIES COMMISSION, APPELLEE AND CROSS-APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.,* Slip Opinion No. 2014-Ohio-3764.]

*Public utilities—Electric security plan—Fuel adjustment clause—Adjustment for cancellation of contract and settlement agreement with coal supplier.*

(No. 2012-1484—Submitted March 12, 2014—Decided September 3, 2014.)

APPEAL AND CROSS-APPEAL from the Public Utilities Commission,

Nos. 09-872-EL-FAC and 09-873-EL-FAC.

_____

O'CONNOR, C.J.

SUMMARY

{¶ 1} In 2009, the commission approved the first electric security plan ("ESP") for the American Electric Power operating companies, Columbus

Southern Power and Ohio Power Company (hereafter referred to jointly as "AEP" or the "companies"). This ESP was in effect from 2009 through 2011.

{¶ 2} As part of the ESP, the commission approved a fuel-adjustment clause ("FAC"), which allowed the companies to recover fuel costs for providing generation service as those costs were incurred, without having to file a new rate case. The FAC operates as a separate charge from the base generation rate. The FAC automatically goes up and down with the cost of fuel, while the base rate stays the same.

{¶ 3} The commission also required that the FAC be subjected to quarterly updates and annual prudency and accounting reviews to reconcile the rates collected with the actual fuel costs incurred. The updates and annual reviews were designed to ensure that AEP was recovering only the true cost of fuel from ratepayers.

{¶ 4} This appeal stems from the commission's first annual review of AEP's FAC mechanism, covering the time period from January 1 to December 31, 2009. In the case below, an auditor found that both Ohio Power and Columbus Southern Power had underrecovered fuel costs through the FAC in 2009.[1] The auditor recommended that the commission review whether any proceeds that AEP had received from a 2008 contract settlement agreement with a coal supplier should be credited against Ohio Power's underrecovered fuel costs for 2009, given that the settlement agreement resulted in Ohio Power having to purchase a portion of its coal at a higher price starting in 2009. After review, the commission found that all of the proceeds from this settlement agreement should be offset against Ohio Power's FAC underrecovery. On rehearing, the commission clarified that only the share of the settlement proceeds allocable to Ohio retail customers must be credited.

---

[1] Columbus Southern Power's underrecovery is not at issue in this case.

**{¶ 5}** Ohio Power appealed, challenging the commission's decision to credit the proceeds from the 2008 settlement against the underrecovered 2009 fuel costs. Industrial Energy Users–Ohio ("IEU") filed a cross-appeal, arguing that the commission erred on rehearing when it limited the amount of the credit to only those proceeds allocable to Ohio retail customers.

**{¶ 6}** For the reasons discussed in detail below, we affirm the commission's orders.

### FACTS AND PROCEDURAL BACKGROUND

**{¶ 7}** Ohio requires electric-distribution utilities to provide consumers with "a standard service offer of all competitive retail electric services necessary to maintain essential electric service to consumers, including a firm supply of electric generation service." R.C. 4928.141(A). The standard-service offer is applicable to customers who receive generation service from the incumbent distribution utility instead of buying it on the market from a provider of competitive retail electric service. "The utility may provide the offer in one of two ways: through a 'market-rate offer' under R.C. 4928.142 or through an 'electric security plan' under R.C. 4928.143." *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 5. AEP chose to provide standard service under an electric security plan.

**{¶ 8}** On March 18, 2009, the commission issued an opinion and order approving AEP's first ESP, to be in effect from 2009 to 2011. *In re Application of Columbus S. Power Co. and Ohio Power Co. for Approval of an Electric Security Plan*, Pub. Util. Comm. Nos. 08-917-EL-SSO and 08-918-EL-SSO (March 18, 2009) (the "ESP Order").[2] In the ESP Order, the commission

---

[2] We first reviewed the commission's approval of the electric security plan in 2011. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655. In that case, we found that the commission committed reversible error on three issues, and remanded for further consideration. The commission's remand order was appealed. We affirmed the

authorized a FAC mechanism for the companies to recover costs associated with fuel, purchased power, and environmental compliance. The commission did so under R.C. 4928.143(B)(2)(a), which provides for the "[a]utomatic recovery" of "the cost of fuel used to generate the electricity supplied under the [standard service] offer," "provided the cost is prudently incurred." In order to reconcile the rates collected under the FAC with the actual fuel costs incurred by the companies to provide generation service, the commission established quarterly FAC adjustments and an annual audit to review the prudence of the fuel-procurement decisions and the appropriateness of the accounting of the FAC costs.

{¶ 9} In the ESP Order, the commission also established caps on how much AEP could increase its rates each year of the plan. *See* R.C. 4928.144 (authorizing "any just and reasonable phase-in of any electric distribution utility rate * * * as the commission considers necessary to ensure rate or price stability for consumers"). Under the rate caps, AEP could increase rates only by a set percentage each year. During the term of the ESP, AEP deferred for future collection a portion of the annual incremental fuel costs recovered under the FAC that exceeded the rate caps. Amounts earned but not collected each year would go into a deferral account and, as required by R.C. 4928.144, accrue carrying charges.

{¶ 10} Prior to the 2009 ESP, the companies were operating under a Rate Stabilization Plan ("RSP"), which the commission approved in 2005 to be in effect from 2006 through 2008. *In re Application of Columbus S. Power Co. and Ohio Power Co. for Approval of a Post-Market Development Period Rate Stabilization Plan*, Pub. Util. Comm. Nos. 04-169-EL-UNC (Jan. 26, 2005) (hereafter the "RSP Order"). Among other things, the RSP provided AEP with

---

remand order on February 13, 2014. *In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863.

4

automatic, fixed increases in generation rates for the three years of the plan. Unlike the ESP, the generation rates under the RSP were bundled, meaning that there was no separate FAC mechanism to recover fuel costs above the levels set in rates. In sum, AEP was guaranteed to recover the fixed level of fuel costs embedded in its generation rates, but AEP bore the risk of loss if costs rose above the amount collected in rates. Thus, once the terms of the ESP replaced those of the RSP in 2009, AEP no longer bore the same risk of loss from rising fuel costs.

{¶ 11} Before and during the effective period of the RSP, Ohio Power regularly purchased coal from one of its suppliers, Peabody Development Company, at a fixed price under the terms of a 20-year coal-supply contract.[3] The contract was effective through 2012, but by mid-2007, the price of coal under the contract was significantly below the market price for coal. A dispute over the contract arose that Ohio Power decided to resolve to avoid litigation.

{¶ 12} Under the settlement agreement, Ohio Power and Peabody agreed to terminate the 1992 contract as of the end of 2008. Thus, in 2009, Ohio Power had to begin purchasing replacement coal to fuel its generation plants at much higher market prices. In exchange for agreeing to the early termination, Ohio Power received total proceeds of $71.6 million. Specifically, Peabody paid Ohio Power $30 million in cash. Peabody also transferred a West Virginia coal reserve to Ohio Power, which the company valued at $41.6 million.

{¶ 13} This case began when the commission initiated an audit proceeding to review the companies' FAC for 2009. *See In re Fuel Adjustment Clauses for Columbus S. Power Co. and Ohio Power Co.*, Pub. Util. Comm. Nos. 09-872-EL-FAC and 09-873-EL-FAC (Nov. 18, 2009). In January 2010, the commission

---

[3] The agreement was between American Electric Power Service Corporation, a subsidiary of American Electric Power Company, and Peabody. Because this case involves only Ohio Power's fuel costs, we refer solely to Ohio Power as the party of interest.

appointed Energy Ventures Analysis, Inc. to perform a management/performance audit and a financial audit.

{¶ 14} Energy Ventures Analysis filed its audit report with the commission in May 2010. The audit report noted that AEP's fuel supply is largely coal-based, and coal-procurement costs are by far the largest component of the FAC. The report found that at the end of the first year (2009) of the FAC, AEP experienced a large underrecovery of fuel costs. The underrecovery amounts totaled $297.6 million for Ohio Power and $37.5 million for Columbus Southern Power. According to the auditor, many components contributed to the underrecovery, but two coal-contract events alone explained more than half of it.

{¶ 15} The auditor made no recommendation regarding the first coal contract event. But the auditor recommended that the commission review whether any proceeds that Ohio Power had received from the second contract event—the 2008 settlement agreement with Peabody—should be credited against Ohio Power's underrecovered fuel costs for 2009.

{¶ 16} In its opinion and order, the commission determined that all proceeds from the settlement agreement should be credited against Ohio Power's FAC underrecovery for 2009. *In re Fuel Adjustment Clauses for Columbus S. Power Co. and Ohio Power Co.*, Pub. Util. Comm. Nos. 09-872-EL-FAC and 09-873-EL-FAC (Jan. 23, 2012) (the "FAC Order"). Ohio Power had previously booked $13.3 million of the settlement proceeds as a credit against the FAC underrecovery for 2009 and 2010, with the remaining $58.3 million credited to 2008 fuel expenses. The commission, however, required Ohio Power to credit the $58.3 million to offset underrecovered fuel costs for 2009.

{¶ 17} The commission recognized that this situation was unique because Ohio Power's fuel costs were not regulated in 2008 when the settlement agreement occurred and Ohio Power had recorded the benefits of that agreement on its books of account. But the commission found that Ohio Power ratepayers

were paying significantly more for coal in 2009 than they would have paid had Ohio Power not entered into the settlement agreement. The commission reasoned that the price of coal under the Peabody supply contract was significantly below market in 2008 and absent the settlement agreement Ohio Power would have continued to receive shipments of low-priced coal under the contract through the ESP period (2009 through 2011). And because the Peabody contract was terminated at the end of 2008, Ohio Power had to purchase replacement coal to fuel its generation plants at significantly higher prices in 2009. Therefore, the commission held that "in order to determine the real economic cost of coal used during the [2009] audit period, more of the value realized by [Ohio Power] for entering into the Settlement Agreement should flow through to [Ohio Power] ratepayers through a credit to [Ohio Power]'s under-recovery and deferrals."

{¶ 18} In addition, the commission noted that the true value of the coal reserve was not yet known and that Ohio Power had planned to begin the permitting process to mine the coal, which would enhance the value of the reserve. Therefore, the commission directed Ohio Power to hire an auditor to examine the value of the coal reserve and to make a recommendation to the commission as to whether the increased value—if any—above the $41.6 million already required to be credited should also be credited to Ohio Power's ratepayers.

{¶ 19} On rehearing, the commission reduced the amount of the settlement proceeds to be credited against Ohio Power's underrecovery for 2009. The commission recognized that Ohio Power's fuel expenses are allocated between Ohio retail expenses, non-Ohio retail expenses, and wholesale expenses and that the same is true regarding the allocation of revenues. The commission therefore determined that only the share of the settlement proceeds allocable to Ohio retail customers of Ohio Power was required to be credited against the 2009 FAC underrecovery.

**{¶ 20}** During the next round of rehearings, IEU challenged this determination, arguing that the settlement proceeds should be allocated fully to Ohio retail jurisdiction customers. The commission rejected IEU's claim.

**{¶ 21}** Ohio Power then filed this appeal, and IEU followed with a cross-appeal. After review, we find that neither party has demonstrated reversible error.

## STANDARD OF REVIEW

**{¶ 22}** "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6869, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id.*

**{¶ 23}** Although we have "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

DISCUSSION

**Ohio Power's Appeal**

{¶ 24} Ohio Power challenges the commission's orders on three primary grounds: (1) the commission engaged in unlawful retroactive ratemaking when it credited the settlement proceeds against 2009 FAC costs, (2) ratepayers have no valid claim to the proceeds associated with the coal reserve, and (3) the commission lacked jurisdiction to modify the ESP Order. None of these arguments compels reversal.

**I. Ohio Power's Proposition of Law No. I: The commission engaged in unlawful retroactive ratemaking and violated the prohibition against retroactive application of laws**

{¶ 25} In its first proposition of law, Ohio Power contends that the commission's decision constitutes unlawful retroactive ratemaking. In addition, Ohio Power argues that the commission's orders applied 2008 Am.Sub.S.B. No. 221 retroactively in violation of Section 28, Article II of the Ohio Constitution and R.C. 1.48.

{¶ 26} The gravamen of Ohio Power's retroactivity arguments is that the commission has reached back into the prior RSP rate plan to review a fuel transaction that occurred in 2008, which is outside the FAC audit period under review in this case.

**A. Ohio Power presented no evidence that supported its retroactive-ratemaking argument**

{¶ 27} Ohio Power's primary argument under its first proposition of law is that the commission engaged in unlawful retroactive ratemaking when it applied the proceeds from the 2008 settlement agreement to offset 2009 fuel costs, instead of applying those proceeds against 2008 fuel costs. But Ohio Power has provided no evidence that the underlying order affected the rates charged in 2008 under the RSP. Nor has Ohio Power demonstrated that the commission's decision to apply

proceeds from the 2008 settlement agreement against 2009 fuel costs was unreasonable.

**{¶ 28}** Ohio Power's theory centers on the filed-rate doctrine. Under this doctrine, a utility may charge only the rates fixed by its current, commission-approved tariff. *See* R.C. 4905.32; *Keco Industries, Inv. v. Cincinnati & Suburban Bell Tel. Co.*, 166 Ohio St. 254, 257, 141 N.E.2d 465 (1957). *Keco* and its progeny also hold that present rates may not make up for excessive rate charges due to regulatory delay. *Green Cove Resort I Owners' Assn. v. Pub. Util. Comm.*, 103 Ohio St.3d 125, 2004-Ohio-4774, 814 N.E.2d 829, ¶ 27 ("Neither the commission nor this court can order a refund of previously approved rates, however, based on the doctrine set forth in *Keco* * * *"). And though the commission has the power to invalidate a rate schedule and fix new rates, this ratemaking power is prospective only. *See Ohio Util. Co. v. Pub. Util. Comm.*, 58 Ohio St.2d 153, 157-158, 389 N.E.2d 483 (1979).

**{¶ 29}** Ohio Power maintains that the commission violated the filed-rate doctrine because the "financial impact" of the commission's FAC Order is to retroactively reduce commission-approved rates charged in 2008 under the RSP. Ohio Power states that because a fixed level of fuel costs was embedded in rates charged under the RSP, it bore the entire risk for unrecovered fuel costs during the RSP period if fuel costs rose above the amounts collected in rates. Ohio Power asserts that in the underlying order the commission increased the company's 2008 fuel costs by taking proceeds from the settlement agreement that should have been applied against 2008 fuel costs and applying them to offset 2009 fuel costs. According to Ohio Power, the effect of the order was to retroactively reduce the RSP generation rates (by increasing the cost of fuel used to provide power in 2008 above the level charged in rates under the RSP), thereby causing a loss in revenue to the company.

{¶ 30} Whether the commission's FAC order reduced Ohio Power's RSP rates, in effect or explicitly, is a question of fact. Indeed, two essential premises of Ohio Power's argument here are *factual*: (1) that crediting proceeds from the 2008 settlement agreement against 2009 fuel costs increased Ohio Power's cost of fuel used to generate power in 2008 and (2) that the guaranteed rate increases built into the RSP did not recover fuel costs incurred by the company in 2008. Yet Ohio Power provides only a single citation to the record to support its claim. That citation, however, is not helpful.

{¶ 31} The pertinent section of Ohio Power's initial brief contains a single citation to the record: the Audit Report at 2-23 and 2-24. In this part of its brief, Ohio Power challenges the commission's finding that ratepayers had paid significantly more for coal beginning in 2009 than they otherwise would have absent the 2008 settlement agreement. According to Ohio Power, this section of the Audit Report proves the opposite: that "[t]he evidence confirms that the probable result, absent the 2008 Buyout Agreement, was that the supplier for the underlying coal contract would have defaulted and AEP Ohio would have had to procure replacement coal at higher prices" in 2009. But the section of the Audit Report cited has nothing to do with the 2008 settlement agreement. Rather, the report refers to an agreement that Ohio Power had entered into with a different coal supplier.

{¶ 32} Moreover, a review of the record confirms the commission's finding that ratepayers paid more in 2009 fuel costs as a result of the 2008 settlement agreement. The record reflects that the 2008 settlement agreement terminated a 20-year coal-supply contract entered into by Ohio Power and Peabody in 1992. Under the terms of the settlement agreement, Ohio Power was to continue to receive coal from Peabody at the 1992 contract price—which was significantly below market at the time of the settlement—through the end of 2008. The Audit Report determined that absent the buyout of the contract, shipments of

coal would have continued at the below-market contract price through the ESP period. According to the audit, the early termination of the Peabody contract at the end of 2008 forced Ohio Power to purchase replacement coal at market prices beginning in 2009. This evidence affirmatively supports what the commission found: that the 2008 settlement agreement increased the cost of fuel that Ohio Power used to provide electricity in 2009, thereby justifying the decision to apply proceeds from the agreement to offset 2009 fuel costs. But the 2008 settlement agreement did not affect 2008 fuel costs under the RSP since under the terms of the settlement, Ohio Power was to continue to pay the same price for fuel under the Peabody contract until the contract terminated at the end of 2008.[4]

{¶ 33} Ohio Power bears the burden as the appellant to show that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *AK Steel Corp. v. Pub. Util. Comm.*, 95 Ohio St.3d 81, 86, 765 N.E.2d 862 (2002). In the end, Ohio Power has pointed to nothing in the record that rates or fuel costs under the RSP were affected by the commission's order. Ohio Power cannot expect the court simply to take counsel's word on questions of fact, but that is what its merit brief effectively does.

## B. Ohio Power's regulatory-accounting argument also lacks record support

{¶ 34} Ohio Power's retroactive-ratemaking argument also hinges, in part, on its claim that the company had booked the 2008 settlement agreement under proper regulatory accounting principles.[5] Ohio Power asserts that the true cost of

---

[4] Ohio Power subsequently agreed to release Peabody from delivering coal under the 1992 contract for the remainder of 2008. Under this buyout—referred to as the delivery-shortfall agreement—Ohio Power received a cash payment in return for terminating Peabody's remaining obligations under the 1992 contact. Audit Report at 2-21. The commission did not order Ohio Power to credit any of the proceeds from the delivery-shortfall agreement to customers during the 2009 audit.

[5] Ohio Power also argues that there was no evidence to rebut the presumption that 2009 fuel costs were prudently incurred. Any arguments regarding the prudence review of Ohio Power's fuel

fuel incurred to provide power is measured by the amounts recorded on Ohio Power's books of account. Ohio Power maintains that the evidence confirms that the 2008 settlement agreement was properly booked in 2008 and 2009 to offset fuel costs incurred in those years. Ohio Power therefore contends that the commission had no legal or record basis to retroactively seize the settlement proceeds. These arguments lack merit for the following reasons.

{¶ 35} First, Ohio Power ignores that "the commission has express statutory authority under R.C. 4905.13 to prescribe the manner in which a utility must keep its books of account." *Consumers' Counsel v. Pub. Util. Comm.*, 4 Ohio St.3d 111, 115, 447 N.E.2d 749 (1983). That is, the commission determines whether revenues and expenses are properly booked, not the utility.

{¶ 36} Second, Ohio Power has again failed to marshal any evidence in its first merit brief to support its appellate arguments. Ohio Power's failure to offer relevant citations to the record to support its appellate arguments is a fatal flaw. *Allnet Communications Serv., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 206, 638 N.E.2d 516 (1994) (rejecting argument where appellant provided no "record citations to support" it); *State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 120 Ohio St.3d 386, 2008-Ohio-6254, 899 N.E.2d 975, ¶ 40; *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 13, quoting *Day v. N. Indiana Pub. Serv. Corp*, 164 F.3d 382, 384 (7th Cir.1999) ("Appellate attorneys should not expect the court to 'peruse the record without the help of pinpoint citations' to the record").

---

purchases miss the mark because the prudence of Ohio Power's fuel transactions had no bearing on the commission's determination.

**{¶ 37}** Ohio Power does offer evidence and additional arguments to support this claim in its reply brief.[6]  Ohio Power, however, is barred from raising new arguments and offering evidence for the first time on reply.  *See Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 54.

**{¶ 38}** For the foregoing reasons, we reject Ohio Power's retroactive-ratemaking argument.

### C.  Ohio Power failed to develop its argument on retroactive application of the law

**{¶ 39}** Ohio Power also contends in support of the first proposition of law that the approach taken by the commission in its opinion and order "amounts to the retroactive application of SB 221 in violation of the Ohio Constitution and Ohio Revised Code."  *See* Article II, Section 28 of the Ohio Constitution ("The general assembly shall have no power to pass retroactive laws * * * ") and R.C. 1.48 (statutes are presumed to apply only prospectively unless specifically made retroactive).  According to Ohio Power, the FAC cannot be applied retroactively to encompass transactions occurring in 2008 because (1) the FAC did not become effective under SB 221 until 2009 and (2) fuel costs under the RSP were not regulated in 2008.

**{¶ 40}** Ohio Power, however, fails to carry its burden here.  At no point does Ohio Power cite a specific legal authority that prohibits the FAC from being applied to fuel transactions in 2008.  Ohio Power makes general references to "SB 221" and its effective date, but this alone does not prove that the commission lacked authority to apply the FAC to 2008 fuel transactions.

---

[6] Specifically, Ohio Power claims that customers were made whole for 2009 fuel costs because it properly booked $13.3 million of the proceeds from the 2008 settlement agreement as a credit against fuel costs incurred in 2009 and 2010, with the remaining $58.3 million credited against 2008 fuel expenses.

**{¶ 41}** Moreover, to determine whether a statute may be retroactively applied, we first ask whether the General Assembly expressly made the statute retroactive. *Hyle v. Porter*, 117 Ohio St.3d 165, 2008-Ohio-542, 882 N.E.2d 899, ¶ 8-10 (applying R.C. 1.48 and Article II, Section 28, Ohio Constitution as a two-part test to determine whether a statute may be applied retroactively). The FAC mechanism was authorized under R.C. 4928.143(B)(2)(a). Yet Ohio Power does not cite this provision, let alone offer an argument as to its construction. Ohio Power cannot expect to prevail on a claim of retroactive application of law when it does not even identify the law at issue.

**{¶ 42}** A party who challenges a final order of the commission has the burden on appeal under R.C. 4903.13 of showing that the order is unlawful or unreasonable. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154, 555 N.E.2d 288 (1990); *Columbus v. Pub. Util. Comm.*, 170 Ohio St. 105, 163 N.E.2d 167 (1959), paragraph two of the syllabus. Ohio Power's argument is inadequately developed, and we reject it on that basis. *See In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 56-57.

### D. Ohio Power has forfeited the alternative argument raised in the first proposition of law

**{¶ 43}** Ohio Power's first proposition of law contains an alternative argument to its retroactive-ratemaking claim. Ohio Power asserts that the commission's order is arbitrary, unreasonable, and against the manifest weight of the evidence because it singles out the 2008 settlement agreement to reduce its 2009 fuel-cost recovery while ignoring another 2008 agreement with a different coal supplier that allowed Ohio Power to avoid paying higher fuel costs in 2008 and beyond. Ohio Power refers to this other agreement as the 2008 Production Bonus Agreement. Under that agreement, Ohio Power paid the supplier a production bonus of $28.6 million to ensure that the supplier remained in business

and was able to continue to supply coal to Ohio Power at below-market contract prices. Ohio Power would like to recover the $28.6 million through 2009 FAC rates on the theory that customers paid less in 2009 fuel costs than they would have if the supplier had defaulted on the supply contracts.

{¶ 44} Ohio Power did not seek to recover the $28.6 million production bonus until it filed an application for rehearing on the commission's order on February 23, 2012. In its April 11, 2012 rehearing entry, the commission refused to consider the impact of the production bonus agreement against 2009 fuel costs. Before this court, Ohio Power now claims that the commission failed to provide record support and a valid rationale for its decision on rehearing.

{¶ 45} It is true that the commission must explain its decisions. R.C. 4903.09 requires the commission to set forth the reasons supporting the decisions arrived at and prohibits summary rulings and conclusions that do not develop the supporting rationale or record. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987). *See also Indus. Energy Users–Ohio v. Pub. Util. Comm.*, 117 Ohio St.3d 486, 2008-Ohio-990, 885 N.E.2d 195, ¶ 30. But the critical problem for Ohio Power is that it never filed a *second* application for rehearing alleging error in the commission's evidence and analysis in the first entry on rehearing. R.C. 4903.10 requires the commission's ruling on any particular issue to be challenged through an application for rehearing before that issue can be appealed. Ohio Power cannot argue for the first time in this court that the commission's rehearing entry lacked adequate record support and reasoning. It must first raise the issue with the commission, giving the commission an opportunity to correct the alleged errors. *See Parma v. Pub. Util. Comm.*, 86 Ohio St.3d 144, 148, 712 N.E.2d 724 (1999) (we do not accept objections when appellant has "deprived the commission of an opportunity to redress any injury or prejudice that may have occurred"). Because Ohio Power did not file a second application that sought rehearing on these grounds, we lack

jurisdiction to consider the arguments now. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 66 (failure to file a second rehearing application challenging new grounds in first rehearing entry jurisdictionally bars this court's review).

### II. Ohio Power's Proposition of Law No. II: The commission's decision to apply the book value of the coal reserve to offset 2009 fuel costs is unlawful and unreasonable

{¶ 46} In proposition of law No. II, Ohio Power claims that the commission erred when it applied the book value of the coal reserve (a component of the 2008 settlement agreement) to offset 2009 fuel costs. Ohio Power offers two separate arguments, but has forfeited both.

### A. Ohio Power has forfeited its claim that ratepayers have no entitlement to the value of the coal reserve acquired in the 2008 settlement agreement

{¶ 47} Ohio Power first claims that there is no legal basis for the commission to apply the value of the coal reserve against 2009 fuel costs. According to Ohio Power, ratepayers have no valid claim to the value of the coal reserve because the commission has long held that ratepayers have no ownership interest in utility assets.

{¶ 48} The commission first addressed Ohio Power's ownership argument on rehearing. In its April 11, 2012 rehearing entry, the commission agreed with Ohio Power that ratepayers had no ownership interest in the coal reserve. The commission went on to explain that an ownership interest in utility assets "is not necessary for the Commission to order, as it did in the FAC order, the alignment of fuel costs with the benefits of AEP-Ohio's fuel contracts."

{¶ 49} Ohio Power now inexplicably argues that the commission "gave scant reason for rejecting its long-held" precedent "that ratepayers do not have an ownership [interest] in utility assets." But Ohio Power never argued on rehearing that the commission erred in failing to follow precedent. That failure

jurisdictionally bars the court from considering the claim. *See* R.C. 4903.10; *Consumers' Counsel v. Pub. Util. Comm.*, 70 Ohio St.3d 244, 247, 638 N.E.2d 550 (1994) ("setting forth specific grounds for rehearing is a jurisdictional prerequisite for our review").[7]

{¶ 50} Apparently recognizing the futility of continuing to argue that the commission failed to follow precedent, Ohio Power changes course and asserts that "[n]o fair label can be given to that transaction [offsetting 2009 fuel costs with the value of the coal reserve] other than a transfer of ownership." Although it is not entirely clear, Ohio Power's point seems to be that the commission in effect transferred ownership of the coal reserve from Ohio Power to ratepayers when it credited the coal reserve value against 2009 fuel costs, and the commission erred in failing to recognize its order in those terms.

{¶ 51} As noted, the commission first addressed the ownership issue in the first rehearing entry. Ohio Power has forfeited this claim as well by failing to present it to the commission in a second application for rehearing. We therefore lack jurisdiction over this claim. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 66.

## B. Ohio Power has also forfeited its claim that the record did not support the valuation

{¶ 52} Ohio Power's second argument is that the record does not support the $41 million valuation given to the coal reserve. Ohio Power, however, failed to include this argument in its notice of appeal. R.C. 4903.13 establishes that the procedure to seek reversal of a commission order is through a notice of appeal "setting forth the order appealed from and the errors complained of." We lack jurisdiction to consider arguments not included in a notice of appeal. *Cincinnati*

---

[7] Even if the issue had been preserved for appeal, Ohio Power has not demonstrated error. As we explained, the commission never rejected this precedent; rather it agreed with Ohio Power's position that ratepayers had no ownership interest in utility assets.

*Gas & Elec. Co. v. Pub. Util. Comm.*, 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238, ¶ 21; *Ohio Partners for Affordable Energy v. Pub. Util. Comm.*, 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, ¶ 16.

### III. Ohio Power's Proposition of Law No. III: The commission lacks jurisdiction to modify its prior adjudicative decisions and may exercise continuing jurisdiction only to enforce final orders

{¶ 53} Ohio Power claims in its final proposition of law that the commission was barred by the doctrines of res judicata and collateral estoppel from revisiting issues in the FAC proceedings that were decided in the first ESP proceedings. "These doctrines operate to preclude the relitigation of a point of law or fact that was at issue in a former action between the same parties and was passed upon by a court of competent jurisdiction." *Consumers' Counsel v. Pub. Util. Comm.*, 16 Ohio St.3d 9, 10, 475 N.E.2d 782 (1985). And these doctrines apply to quasi-judicial administrative proceedings. *State ex rel. Schachter v. Ohio Pub. Emps. Retirement Bd.*, 121 Ohio St.3d 526, 2009-Ohio-1704, 905 N.E.2d 1210 ¶ 29; *Superior's Brand Meats, Inc. v. Lindley*, 62 Ohio St.2d 133, 403 N.E.2d 996 (1980).

### A. Ohio Power has not shown that the FAC Order modified the 2009 FAC audit period or applied the FAC to fuel costs incurred outside the ESP period

{¶ 54} Ohio Power asserts that the commission's FAC Order modified two key issues that were decided in the first ESP case: (1) the FAC mechanism would be limited to the ESP period (2009 through 2011) and (2) the 2009 FAC audit proceeding was limited to a review of fuel costs that were incurred from January 1, 2009, through December 31, 2009. According to Ohio Power, the commission modified these components of the ESP Order when it reviewed fuel procurement activities outside the specific audit period under review and outside the ESP term.

{¶ 55} The commission found that it had not altered the scope of the audit or the audit period under review in this case. The commission specifically

rejected Ohio Power's contention that the ESP Order limited its annual review of the FAC to 2009 procurement activities. After review, we find that Ohio Power has not shown that the commission relitigated any point of law or fact in this case that was decided in the ESP proceedings.

{¶ 56} First, Ohio Power contends that the commission failed to follow its "prior adjudicatory decision" in the ESP Order regarding the ESP period and annual audit review period. Ohio Power cites the ESP Order and testimony from the ESP proceedings to support its claim that the audit and ESP periods were altered by the FAC Order. But none of these references expressly limit the commission's FAC audit to procurement activities occurring only during the ESP period.

{¶ 57} Second, Ohio Power's arguments fail to undermine the commission's rationale for finding that the 2008 settlement agreement was subject to review. The FAC audit was designed to examine the prudence and accounting accuracy of Ohio Power's fuel transactions. The purpose of the FAC audit was to determine the true costs of fuel so that customers paid no more than what was reasonable. The commission recognized that the 2008 settlement agreement was executed before the audit period under review and the start of the ESP. Even so, the commission found it subject to review because the proceeds received from the agreement affected Ohio Power's costs to provide electricity *during 2009*.

{¶ 58} The critical flaw in Ohio Power's arguments is that it wants the commission (and now this court) to consider the 2008 settlement agreement in isolation, looking solely at the date it was executed and not at whether the agreement had any effect on 2009 fuel costs. Under the terms of the agreement, Ohio Power agreed to terminate prematurely the long-term Peabody coal-supply contract at the end of 2008. Without this early buyout of this contract, Ohio Power would have continued to receive shipments of coal at the below-market contract price through the ESP period (2009-2011). And because the Peabody

contract terminated at the end of 2008, Ohio Power had to purchase replacement coal beginning in 2009 at higher prices, which in turn resulted in ratepayers paying more for electricity at the beginning of the ESP period. In short, Ohio Power ignores the impact of the settlement agreement on 2009 FAC costs.

## B. Ohio Power has not shown that the FAC baseline
## was altered by the FAC Order

{¶ 59} Ohio Power also asserts that the commission modified the FAC baseline when it applied proceeds from the 2008 settlement agreement against 2009 FAC costs. While we find no merit to this claim, resolving it requires an understanding of the FAC baseline.

### 1. Background on the FAC Baseline

{¶ 60} As noted above, the FAC is a separate charge from the base rate that will automatically go up and down with the cost of fuel. In order to determine whether fuel costs had gone up beyond the amount already recovered in the base rate, it was necessary to set a baseline. The base rate was to include 2009 fuel costs, but the ESP hearing ended in 2008 and the actual 2009 costs were not known at that time. So the commission needed to estimate. IEU had proposed reopening the record to use 2008 costs as a proxy for 2009. AEP had proposed a different estimation method altogether. The commission, following the staff's recommendation, chose 2007 fuel costs as the FAC baseline.

{¶ 61} The setting of the FAC baseline also had an impact on setting the base generation rate of the ESP. The ESP separated Ohio Power's bundled generation rate under the RSP into the FAC and non-FAC components. The non-FAC components were determined by subtracting the FAC baseline from the total generation rate. This meant that if the FAC baseline were set low, the base portion of the generation rate (the non-FAC portion) would be higher, and vice versa. The FAC baseline adopted by the commission was lower than the baseline advocated by IEU, resulting in a higher non-FAC generation rate.

## 2. Ohio Power has not carried its burden of demonstrating error

{¶ 62} Ohio Power's theory is that when the commission applied the proceeds from the 2008 settlement agreement against the 2009 FAC costs, it modified the FAC baseline to a higher value, and thereby reduced "2009 fuel adjustment clause-related increase in rates." Although Ohio Power's brief is not entirely clear, Ohio Power is apparently claiming that the decision to reduce the recovery of FAC costs for 2009 by the amount of the 2008 settlement proceeds also reduced Ohio Power's non-FAC generation rate recovery.

{¶ 63} Ohio Power, however, offers no evidence to support its theory that the FAC Order had an impact on the base generation rate set by the ESP Order. And Ohio Power does not even assert, much less demonstrate, that its base generation rate under the ESP was insufficient to cover its non-FAC costs. Ohio Power's failure to support its appellate arguments with relevant citations to the record is alone grounds to reject it. *Allnet Communications Serv., Inc. v. Pub. Util. Comm.*, 70 Ohio St.3d 202, 206, 638 N.E.2d 516 (1994) (rejecting argument when appellant "provided no further reasoning or record citations to support" it).

{¶ 64} In the end, Ohio Power has not demonstrated that the commission violated the doctrines of res judicata or collateral estoppel. Therefore, we reject proposition of law No. III.

### IEU's Cross-Appeal

**IEU Proposition of Law No. IV: The commission's FAC Order is unlawful and unreasonable because on rehearing, the commission failed to allocate 100 percent of the credit for the buyout to Ohio retail jurisdictional customers**

{¶ 65} IEU argues on cross-appeal that the commission erred on rehearing when it reduced the amount of the settlement proceeds to be credited against Ohio Power's underrecovered FAC costs. The commission found that only the portion of the settlement proceeds allocable to Ohio retail jurisdictional customers should be credited against the 2009 FAC costs. IEU maintains that the commission's

decision is unlawful and unreasonable on three grounds: (1) the commission's rehearing entries—dated April 11, 2012, and July 2, 2012—are not supported by the record, (2) the July 2 rehearing entry is contradicted by the record, and (3) the July 2 entry conflicts with Ohio Adm.Code 4901:1-35-03(C)(9)(a)(ii).

{¶ 66} We agree with IEU that the commission failed to cite any evidence in these rehearing entries, in violation of R.C. 4903.09. *See Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87, 89, 706 N.E.2d 1255 (1999) (strict compliance with R.C. 4903.09 is not required, but the commission abuses its discretion if it renders an opinion on an issue without record support). IEU, however, has forfeited these arguments by failing to preserve them on rehearing.

## A. The April 11, 2012 Rehearing Entry

{¶ 67} The commission's opinion and order determined that all of the proceeds from the 2008 settlement agreement should be used to offset the higher fuel costs charged to ratepayers in 2009. Ohio Power filed an application for rehearing, arguing that the order overstated the amount of the offset because only a portion of the settlement proceeds should have been allocated to Ohio retail customers.

{¶ 68} On rehearing, the commission agreed. The commission found that Ohio Power's fuel expenses are allocated between Ohio retail expenses, non-Ohio retail expenses, and wholesale expenses. The commission found that the same was true with regard to the allocation of revenues. Therefore, the commission clarified that only the share of the settlement proceeds allocable to Ohio retail customers must be credited against 2009 fuel costs.

{¶ 69} On cross-appeal, IEU argues that the commission failed to identify any evidence in its April 11 entry to support this conclusion. IEU, however, did not argue in its May 11, 2012 application for rehearing that the commission failed to support its order with record evidence. Setting forth specific grounds for rehearing is a jurisdictional prerequisite for this court's review. *Ohio Partners for*

*Affordable Energy v. Pub. Util. Comm.,* 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, ¶ 15.

**{¶ 70}** IEU counters that it preserved this issue with the following statement: "OP has failed to provide any proof that Ohio consumers should be deprived of the full amount of the benefits received by OP in exchange for the higher costs of fuel paid by Ohio customers." But claiming that Ohio Power failed to provide proof to support an argument is not the same thing as claiming that the commission failed to identify record evidence to support its order. And even if this statement were sufficient to preserve the issue for review, none of the arguments or evidence in IEU's brief on this issue was set forth in its rehearing application. "[W]hen an appellant's grounds for rehearing fail to specifically allege in what respect the PUCO's order was unreasonable or unlawful, the requirements of R.C. 4903.10 have not been met." *Discount Cellular*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59 (cases cited). Indeed, we have strictly construed the specificity test set forth in R.C. 4903.10. *Id.* *See also Cincinnati v. Pub. Util. Comm.*, 151 Ohio St. 353, 378, 86 N.E.2d 10 (1949) (by using the language set forth in R.C. 4903.10, "the General Assembly indicated clearly its intention to deny the right to raise a question on appeal where the appellant's application for rehearing used a shotgun instead of a rifle to hit that question"). So regardless of what appears in IEU's brief on cross-appeal, the only arguments properly before the court are those also set forth in IEU's application for rehearing in the case below.

### B. The July 2, 2012 Rehearing Entry

**{¶ 71}** The commission rejected IEU's May 11 rehearing application in an entry dated July 2, 2012. IEU asserts on cross-appeal that the commission failed to identify any evidence to support this entry. But IEU never filed an application for rehearing that alleged that the July 2 entry lacked record evidence. That means that IEU never sought rehearing on these grounds, so the court lacks

jurisdiction to consider the arguments now. *Ohio Partners for Affordable Energy v. Pub. Util. Comm.,* 115 Ohio St.3d 208, 2007-Ohio-4790, 874 N.E.2d 764, ¶ 15; *In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 31.

{¶ 72} In addition to claiming that the commission failed to support its rehearing entry with record evidence, IEU argues that the record contradicts the commission's determination. IEU refers here to the commission's rejection of IEU's least-cost-allocation claim. IEU had argued in its May 11 rehearing application that the Peabody contract was the "lowest cost fuel source." Because the ESP required Ohio Power to allocate the least costly fuel to its standard-service-offer customers, IEU argued that Ohio Power was required to allocate all of the settlement proceeds from the buyout of the Peabody contract to these customers. The commission rejected IEU's claim, finding that the allocation of fuel on a least-cost basis was determined by the average dispatch cost associated with a specific generation plant, rather than on any one particular supply contract, as IEU alleged.

{¶ 73} On cross-appeal, IEU abandons its argument that the Peabody contract was the "lowest cost fuel source," in favor of an entirely new argument. IEU's new theory is that the electricity produced at the Mitchell generating station would have been the least-cost-generating output in Ohio Power's fleet if the settlement agreement had not occurred. According to IEU, if the coal from the Peabody contract had been burned at the Mitchell plant, then all proceeds to buy out that contract should have been allocated to Ohio Power's standard-service-offer customers. But in addition to being speculative and supported by evidence outside the record, IEU's Mitchell theory was not presented to the commission on rehearing. Therefore, IEU has forfeited this claim.

**{¶ 74}** Finally, IEU argues that the commission's July 2 rehearing entry conflicts with OhioAdm.Code 4901:1-35-03(C)(9)(a)(ii). IEU has also forfeited this claim by failing to present it to the commission on rehearing.

## CONCLUSION

**{¶ 75}** In sum, Ohio Power and IEU have not carried their burden of showing reversible error in the commission's orders. R.C. 4903.13; *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154, 555 N.E.2d 288 (1990). Therefore, we affirm.

Orders affirmed.

PFEIFER, O'DONNELL, LANZINGER, and O'NEILL, JJ., concur.

KENNEDY and FRENCH, JJ., concur in judgment only.

_____

Steven T. Nourse and Matthew J. Satterwhite, and Porter, Wright, Morris & Arthur, Kathleen M. Trafford, and Daniel R. Conway, for appellant and cross-appellee, Ohio Power Company.

Mike DeWine, Attorney General, William L. Wright, Thomas W. McNamee, and Devin D. Parram, Assistant Attorneys General, for appellee and cross-appellee, Public Utilities Commission of Ohio.

McNees, Wallace & Nurick, Samuel C. Randazzo, Frank P. Darr, and Matthew R. Pritchard, for appellee and cross-appellant, Industrial Energy Users–Ohio.

_____