**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Establishing the Solar Generation Fund Rider*, Slip Opinion No. 2022-Ohio-4348.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4348

IN THE MATTER OF ESTABLISHING THE SOLAR GENERATION FUND RIDER PURSUANT TO R.C. 3706.46;

OHIO MANUFACTURERS' ASSOCIATION ENERGY GROUP, APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE; OHIO POWER COMPANY, INTERVENING APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Establishing the Solar Generation Fund Rider*, Slip Opinion No. 2022-Ohio-4348.]**

*Public utilities—R.C. 3706.46—Public Utilities Commission's order authorizing solar-generation-fund rider affirmed in part and reversed in part and cause remanded for clarification.*

(No. 2021-1374—Submitted July 12, 2022—Decided December 7, 2022.)

APPEAL from the Public Utilities Commission, No. 21-447-EL-UNC.

_____

**O'CONNOR, C.J.**

{¶ 1} This appeal arises from an order of the Public Utilities Commission that authorized a recovery mechanism referred to as the solar-generation-fund rider ("Rider SGF"). Ohio electric-distribution utilities charge Rider SGF each month to their retail customers, but they do not retain the money recovered through it. Instead, they pass the money through to the solar generation fund, which is then used to subsidize the operations of qualifying solar-resource generators in Ohio.

{¶ 2} The Ohio Manufacturers' Association Energy Group ("OMAEG"), filed this appeal raising various challenges to the amount and structure of Rider SGF.

{¶ 3} For the reasons discussed below, we affirm in part and reverse in part the commission's order and remand the cause to the commission for clarification on one issue.

## I. FACTS AND PROCEDURAL BACKGROUND
### A. *2019 Am.Sub.H.B. No. 6 and 2021 Am.Sub.H.B. No. 128*

{¶ 4} In October 2019, Am.Sub.H.B. No. 6 ("H.B. 6") went into effect. Among other things, the bill authorized payments to subsidize the operations of certain in-state nuclear-energy- and renewable-energy-resource facilities. H.B. 6 established a "nuclear generation fund" that would allow for total disbursements of $150 million annually to qualifying nuclear generators and a "renewable generation fund" that would allow for annual disbursements of $20 million to "qualifying renewable resource" facilities. Former R.C. 3706.46, 2019 Am.Sub.H.B. No. 6. To generate revenue for both funds, the bill required each Ohio electric-distribution utility to collect a monthly charge from all customers. *Id.*

{¶ 5} In June 2021, the General Assembly enacted Am.Sub.H.B. No. 128 ("H.B. 128"), which repealed certain portions of H.B. 6, including those related to the creation of the nuclear generation fund, but left in place the renewable generation fund, which was renamed the "solar generation fund." H.B. 128 retained

from H.B. 6 the requirement that disbursements from the solar generation fund would be capped at $20 million annually. R.C. 3706.46. It also retained the requirement that revenue for the solar generation fund would be generated through a monthly retail charge to customers that would be billed and collected by the Ohio electric-distribution utilities. *Id.*

{¶ 6} The commission has discretion to determine "the method by which the revenue is allocated or assigned to each electric distribution utility for billing and collection," with certain limits that are not relevant here. R.C. 3706.46(A)(2). And the commission is authorized to determine "the level and structure of any charge to be billed and collected by each electric distribution utility," but there are specific limits on the monthly amounts that residential and certain nonresidential customers may be charged. R.C. 3706.46(B).

### B. The commission's proceedings

{¶ 7} In April 2021, the commission opened a case for the purpose of establishing a new recovery mechanism under R.C. 3706.46 that would be used to meet the annual revenue requirement for the solar generation fund. The commission staff filed comments and recommendations regarding the proposed Rider SGF. Several parties filed comments for and against the commission staff's recommendations.

{¶ 8} On July 14, 2021, the commission issued an order establishing Rider SGF as the recovery mechanism that would be used to provide revenue for the solar generation fund. OMAEG filed an application for rehearing, which the commission denied.

{¶ 9} OMAEG appealed to this court. The commission has filed a brief in defense of its order. The Ohio Power Company has intervened as an appellee to oppose reversal.

## II.  STANDARD OF REVIEW

{¶ 10} "R.C. 4903.13 provides that a [Public Utilities Commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50.  We will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty.  *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29.  The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id*.

{¶ 11} Although this court has "complete and independent power of review as to all questions of law" in appeals from the Public Utilities Commission, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law when "highly specialized issues" are involved and when "agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly," *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

## III. DISCUSSION

{¶ 12} OMAEG raises five propositions of law.  As will be discussed, we remand this matter to the commission for clarification of the issue addressed in OMAEG's fourth proposition of law, but the remaining propositions lack merit.

### A. *Proposition of law No. I: Whether the commission erred by establishing an annual revenue requirement of $20 million for Rider SGF*

{¶ 13} In its first proposition of law, OMAEG argues that the commission erred when it established a fixed annual revenue requirement of $20 million for Rider SGF. The provision at issue here is R.C. 3706.46(A)(1), which provides:

> Beginning for all bills rendered on or after January 1, 2021, by an electric distribution utility in this state, such electric distribution utility shall collect from all of its retail electric customers in this state, each month, a charge which, in the aggregate, is sufficient to produce a revenue requirement of twenty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the solar generation fund.

{¶ 14} OMAEG asserts that in enacting R.C. 3706.46(A)(1), the General Assembly tied the annual revenue requirement to R.C. 3706.55, which remits money from the solar generation fund to qualifying-solar-resource operators based on their generation output.[1] Under OMAEG's reading of R.C. 3706.46(A)(1), the amount collected from customers each year through the Rider SGF cannot exceed what is needed to pay the disbursements earned each year by solar-resource operators under R.C. 3706.55, up to a maximum amount of $20 million.

{¶ 15} The commission and Ohio Power argue that R.C. 3706.46(A)(1) clearly establishes a fixed annual revenue requirement of $20 million and does not condition the collection of funds through Rider SGF on the generation output of the

---

1. R.C. 3706.55 requires the Ohio Air Quality Development Authority to direct the state treasurer to remit monies from the solar generation fund to qualifying-solar-resource operators in an amount that is based on the number of solar energy credits earned for each megawatt hour the resource produced and reported to the authority under R.C. 3706.45.

solar resources.  For the reasons explained below, we agree with the commission and Ohio Power and therefore reject OMAEG's first proposition of law.

### 1. The plain language of R.C. 3706.46(A)(1) establishes a fixed annual revenue requirement of $20 million

**{¶ 16}** As with any question involving statutory construction, our analysis must begin with the language of the statute. *In re Application of Duke Energy Ohio, Inc.*, 150 Ohio St.3d 437, 2017-Ohio-5536, 82 N.E.3d 1148, ¶ 19.  R.C. 3706.46(A)(1) requires the commission to establish a recovery mechanism that "is sufficient to produce a revenue requirement of twenty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the solar generation fund."

**{¶ 17}** As noted, OMAEG argues that R.C. 3706.46(A)(1) does not automatically fix the annual revenue requirement at $20 million.  OMAEG maintains that when the word "sufficient" in R.C. 3706.46(A)(1) is read in conjunction with the phrase "for total disbursements required under section 3706.55 of the Revised Code," it is clear that the revenue required is the amount necessary to fund the disbursements committed to be paid out of the solar generation fund, up to $20 million.

**{¶ 18}** OMAEG invokes the statute's use of the word "sufficient" but never discusses the words that immediately follow it.  OMAEG ignores the words "to produce a revenue requirement of twenty million dollars annually."  Thus, when all the words in the statute are read in context, R.C. 3706.46(A)(1) plainly requires the recovery mechanism to be set at an amount that is "sufficient to produce a revenue requirement of twenty million dollars annually."

**{¶ 19}** OMAEG likewise reads out of context the phrase "for total disbursements required under section 3706.55 of the Revised Code" in R.C. 3706.46(A)(1).  Contrary to OMAEG's assertion, this phrase is not a reference to how much money must go into the fund each year.  Instead, when read in

conjunction with the phrase "sufficient to produce a revenue requirement of twenty million dollars annually," the phrase "for total disbursements" refers to the fact that annual expenditures from the fund are limited to $20 million.

{¶ 20} Stated differently, OMAEG interprets R.C. 3706.46(A)(1) as though it included the italicized words in the following sentence:

> [A]n electric distribution utility in this state * * * shall collect * * * a charge which * * * is sufficient to produce a revenue requirement of *up to* twenty million dollars annually for total disbursements required under section 3706.55 of the Revised Code from the solar generation fund.

But the General Assembly did not write R.C. 3706.46(A)(1) that way. And in construing a statute, a court may not add or delete words. *State ex rel. Cincinnati Bell Tel. Co. v. Pub. Util. Comm.*, 105 Ohio St.3d 177, 2005-Ohio-1150, 824 N.E.2d 68, ¶ 32.

### 2. The commission did not violate R.C. 4903.09

{¶ 21} OMAEG additionally argues under its first proposition of law that the commission's decision to set the annual revenue requirement at $20 million lacked any citation to the record, in violation of R.C. 4903.09. Under R.C. 4903.09, an order of the commission in a contested case must provide, in sufficient detail, the facts in the record upon which the order is based and the reasoning behind the commission's conclusion. *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987). According to OMAEG, the commission erred in failing to cite evidence that demonstrates (1) the number of qualifying solar resources in Ohio that have applied to receive disbursements from the solar generation fund, (2) the generation output of those qualifying resources, (3) the number of solar energy credits earned by each qualifying solar resource, and

(4) a calculation of the amount of revenue needed to pay the disbursements from the fund for the solar energy credits that were earned. OMAEG maintains that without these findings of fact, the commission was unable to establish an annual revenue requirement that complies with R.C. 3706.46(A)(1).

{¶ 22} But it was not necessary for the commission to cite evidence supporting its decision, because, as we hold above, R.C. 3706.46(A)(1) itself establishes the fixed annual revenue requirement. The question is one of law, not fact. OMAEG's argument to the contrary hinges on its claim that R.C. 3706.46(A)(1) does not establish a fixed annual revenue requirement of $20 million. Having rejected that argument, we also reject OMAEG's argument that the commission violated R.C. 4903.09.

## B. Proposition of law No. II: Whether the commission violated R.C. 3706.46(B) when it established Rider SGF on a per-account basis

{¶ 23} OMAEG argues under its second proposition of law that the commission erred by establishing Rider SGF on a per-account basis because the plain language of R.C. 3706.46(B) unequivocally directs the commission to implement the charge on a per-customer basis. To generate revenue for the solar generation fund, R.C. 3706.46(B) requires the commission to implement the "per-customer monthly charge" that each electric-distribution utility is to bill and collect from its residential and nonresidential customers. According to OMAEG, this means that electric-distribution utilities must treat a customer with multiple billing accounts as a single customer and charge Rider SGF only once per month, instead of charging the rider for each account a customer maintains.

### 1. The commission's interpretation of "per customer"

{¶ 24} The commission rejected OMAEG's argument that it was required to implement Rider SGF on a per-customer basis. The commission determined that the word "customer" in R.C. 3706.46(B) is clear and unambiguous. Therefore, the commission determined that "Rider SGF will be collected in the same manner that

8

all other riders are collected by [electric-distribution utilities]–in connection with each billing account established in accordance with the applicable contract or tariff." Pub. Util. Comm. No. 21-447-EL-UNC, 2021 WL 3036724, ¶ 16 (July 14, 2021). As a result, the commission concluded that "nonresidential customers shall not be permitted to aggregate or group their billing accounts in order to avoid paying Rider SGF amounts." *Id.*

{¶ 25} The commission based its decision on Ohio Adm.Code 4901:1-10-01(I), which defines "customer" as "any person who has an agreement, by contract and/or tariff with an electric utility * * * to receive service." The commission cited a prior decision, *In re Establishing the Nonbypassable Recovery Mechanism for Net Legacy Generation Resource Costs Pursuant to R.C. 4928.148*, Pub. Util. Comm. No. 19-1808-EL-UNC, ¶ 27 (Nov. 21, 2019), and rehearing entry, 2020 WL 12813040, ¶ 12 (Jan. 15, 2020), in which it had applied this definition in rejecting the same argument by OMAEG in relation to a different rider. The commission determined in that case that based on the definition in Ohio Adm.Code 4901:1-10-01(I), "customer" status depends on the contract or tariff relationship between an electric-distribution utility and the party that receives electric services, and that relationship attaches responsibility for payment to an account or accounts. Consistent with this definition and the historic utility practices used to collect on charges in connection with each billing account in accordance with the applicable tariff or contract, the commission determined that "customer" is synonymous with "account."

### 2. OMAEG has not shown that the commission erred in establishing Rider SGF on a per-account basis

{¶ 26} OMAEG's primary argument on this issue is that the commission "cannot lawfully construe the meaning of 'per-customer' to mean 'per-billing account.' " According to OMAEG, because no ambiguity exists in the phrase "per-customer monthly charge" in R.C. 3706.46(B), the only reasonable interpretation

is that Rider SGF must be charged once per month to each electric-distribution-utility customer, regardless of how many accounts the customer has. OMAEG has failed to demonstrate error.

{¶ 27} It is well established that in construing statutes, when a word has a technical definition that is different from its dictionary definition, it must be construed according to the former. *Hoffman v. State Med. Bd. of Ohio*, 113 Ohio St.3d 376, 2007-Ohio-2201, 865 N.E.2d 1259, ¶ 26, citing *Youngstown Sheet Tube Co. v. Lindley*, 56 Ohio St.2d 303, 309, 383 N.E.2d 903 (1978); *see also* R.C. 1.42 ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly").

{¶ 28} We presume commission orders to be reasonable, and OMAEG, as the appellant, must overcome that presumption. *In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 17. OMAEG, however, completely ignores the commission's legal rationale for finding that Rider SGF should be applied on a per-account basis. In its main brief, OMAEG does not even mention, let alone offer an argument against, the definition of "customer" in Ohio Adm.Code 4901:1-10-01(I), which formed the legal basis for the commission's determination.

{¶ 29} A rule adopted by an administrative agency is valid and enforceable unless it is unreasonable or in conflict with the statutory enactment covering the same subject matter. *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 39. Yet OMAEG has failed to challenge the commission's application of the Administrative Code's definition of "customer." This defeats OMAEG's argument that the commission violated R.C. 3706.46(B) in applying Rider SGF on a per-account basis. *See Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 152 Ohio St.3d 73, 2017-Ohio-7566, 93 N.E.3d 902, ¶ 51; *In re Fuel Adjustment Clauses of Columbus S. Power Co. & Ohio Power Co.*, 140 Ohio St.3d 352, 2014-Ohio-3764, 18 N.E.3d 1157, ¶ 41.

{¶ 30} OMAEG does mount a challenge to the administrative rule's definition of "customer" in its reply brief. OMAEG, however, is barred from raising new arguments for the first time on reply. *Util. Serv. Partners, Inc. v. Pub. Util. Comm.*, 124 Ohio St.3d 284, 2009-Ohio-6764, 921 N.E.2d 1038, ¶ 54. OMAEG is also barred from raising this argument because it did not specify the argument in its application for rehearing before the commission as R.C. 4903.10 requires.

{¶ 31} In the end, it is established doctrine that a party who contends that rates and charges are unreasonable or unlawful bears the burden of demonstrating reversible error on appeal. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 56. OMAEG cannot prevail on a challenge that the commission misinterpreted the word "customer" if it does not challenge the definition that the commission applied to that word. *See Columbus S. Power*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, at ¶ 19; *Duke Energy*, 150 Ohio St.3d 437, 2017-Ohio-5536, 82 N.E.3d 1148, at ¶ 25. We therefore reject OMAEG's second proposition of law.

### C. Proposition of law No. III: Whether the commission violated R.C. 3706.46(B) by failing to limit application of the $242 monthly cap on Rider SGF to industrial customers eligible to become self-assessing purchasers

{¶ 32} In its third proposition of law, OMAEG argues that the commission violated R.C. 3706.46(B), which limits the amounts that electric-distribution utilities can bill residential and nonresidential customers each month for Rider SGF. R.C. 3706.46(B) provides:

> *In authorizing the level and structure of any charge to be billed and collected by each electric distribution utility, the commission shall ensure* that the per-customer monthly charge for residential customers does not exceed ten cents and *that the per-*

*customer monthly charge for industrial customers eligible to become self-assessing purchasers pursuant to division (C) of section 5727.81 of the Revised Code does not exceed two hundred forty-two dollars.* For nonresidential customers that are not self-assessing purchasers, the level and design of the charge shall be established in a manner that avoids abrupt or excessive total net electric bill impacts for typical customers.

(Emphasis added.)

**{¶ 33}** The commission rejected OMAEG's argument that the $242 monthly rate cap under this provision applied only to *industrial* customers eligible to become self-assessing purchasers. The commission instead accepted its staff's recommendation to cap the rate for *all nonresidential* customers that are eligible to become self-assessing purchasers.

**{¶ 34}** OMAEG maintains that R.C. 3706.46(B) expressly applies the $242 monthly cap only to *industrial* customers that are eligible to become self-assessing purchasers and that the commission erred by extending the rate cap to *all nonresidential* customers that are eligible to become self-assessing purchasers. OMAEG additionally argues that the commission's application of the rate cap to nonindustrial customers violates the statutory interpretation canon "expressio unius est exclusio alterius."[2]

**{¶ 35}** As will be discussed, OMAEG fails to show that the commission erred or to explain how its members were prejudiced or harmed by the commission's decision.

---

2. The interpretive cannon "expressio unius est exclusio alterius" provides that the expression of one item in an associated group or series excludes unmentioned items. *Natl. Labor Relations Bd. v. SW Gen., Inc.*, 580 U.S. 288, __, 137 S.Ct. 929, 940, 197 L.Ed.2d 263 (2017), citing *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002); *see also Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, 943 N.E.2d 522, ¶ 35-36.

### 1. What is an eligible self-assessing purchaser?

{¶ 36} Before addressing OMAEG's arguments, we discuss R.C. 5727.81(C), which is cross-referenced in R.C. 3706.46(B). R.C. 5727.81(C) sets forth the requirements and process to become a self-assessing purchaser.

{¶ 37} R.C. 5727.81 concerns the excise tax that is imposed on electric-distribution utilities for distributing electricity to Ohio consumers. In most circumstances, the electric-distribution utility pays the excise tax to the tax commissioner or the state treasurer and then passes the tax on to its customers by increasing its rates. R.C. 5727.81(A). But R.C. 5727.81(C) allows certain purchasers of electricity to "self-assess" the excise tax and pay that amount directly to the taxing authority, thereby relieving the utility of its obligation to pay the excise tax to the taxing authority. The benefit of self-assessing is that the purchaser is taxed at a lesser rate than it would be if the utility paid the excise tax. *See* R.C. 5727.81(A), (C)(2), and (C)(6).

{¶ 38} Under R.C. 5727.81(C)(2), only nonresidential customers that fall into certain categories may become self-assessing purchasers. One category is made up of commercial and industrial customers that received or consumed more than 45 million kilowatt hours of electricity at one location in the preceding year. Another category is made up of "qualified end users"[3] that consumed more than 45 million kilowatt hours of electricity in the preceding year for purposes other than their qualifying manufacturing process. R.C. 5727.81(C)(2).

{¶ 39} For a customer to operate as a self-assessing purchaser, R.C. 5727.81(C)(6) requires (1) submission of an annual application, (2) payment of an annual $500 fee, (3) approval from the tax commissioner, and (4) payment of the

---

3. A "qualified end user" is an end user that (1) uses more than three million kilowatt hours of electricity at one in-state manufacturing location for a calendar day for use in a qualifying manufacturing process or (2) uses electricity at an in-state manufacturing location during a chlor-alkali manufacturing process. R.C. 5727.80(F). A "qualifying manufacturing process" means an electrochemical or chlor-alkali manufacturing process. R.C. 5727.80(I).

self-assessed excise tax. *See also* R.C. 5727.80(J) (defining a "self-assessing purchaser" as "a purchaser that meets all the requirements of, and pays the excise tax in accordance with," R.C. 5727.81(C)).

## 2. OMAEG fails to challenge the specific ground cited by the commission in support of its decision

{¶ 40} OMAEG claims that the commission erred when it interpreted the $242-monthly-cap language in the first sentence of R.C. 3706.46(B) as applying to *all nonresidential* customers that are eligible to become self-assessing purchasers, rather than to only industrial customers. OMAEG, however, misconstrues the commission's order. The commission did not cite the first sentence of R.C. 3706.46(B) as authority to extend the rate cap beyond eligible industrial customers. Instead, the commission found that applying the rate cap to all eligible nonresidential customers "avoids rate shocks and unreasonable bill outcomes, consistent with the legislative direction in this area." Pub. Util. Comm. No. 21-447-EL-UNC, 2021 WL 3036724, at ¶ 15 (July 14, 2021). This language tracks the second sentence of R.C. 3706.46(B): "For nonresidential customers that are not self-assessing purchasers, the level and design of the charge shall be established in a manner that avoids abrupt or excessive total net electric bill impacts for typical customers."

{¶ 41} A party who challenges rates and charges approved by the commission has the burden on appeal under R.C. 4903.13 of showing that they are unjust, unreasonable, or unlawful. *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, at ¶ 56. OMAEG fails to carry its burden here. At no point under its third proposition of law does OMAEG challenge, or even mention, the commission's reliance on the second sentence of R.C. 3706.46(B) as a ground for extending the rate cap. It is well-settled that we presume that commission orders are lawful and reasonable and that it falls on the appellant to overcome that presumption. *See Columbus v. Pub. Util. Comm.*, 170

Ohio St. 105, 163 N.E.2d 167 (1959), paragraph two of the syllabus. As a result, OMAEG's failure to directly challenge the commission's determination as substantively unlawful or unreasonable is fatal to its argument that the commission violated R.C. 3706.46(B). *See In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, 147 Ohio St.3d 59, 2016-Ohio-1607, 60 N.E.3d 1221, ¶ 47.

### 3. OMAEG also fails to demonstrate prejudice or harm stemming from the decision

{¶ 42} OMAEG also overlooks a basic prerequisite to reversing a commission order: the party seeking reversal must show that it has been or will be harmed or prejudiced by the order, *In re Application of Ohio Power Co.*, 140 Ohio St.3d 509, 2014-Ohio-4271, 20 N.E.3d 699, ¶ 31; *In re Complaint of Buckeye Energy Brokers, Inc. v. Palmer Energy Co.*, 139 Ohio St.3d 284, 2014-Ohio-1532, 11 N.E.3d 1126, ¶ 19. OMAEG does not even attempt to show how its members suffered harm or prejudice from the rate cap's extension beyond industrial customers that are eligible to become self-assessing purchasers to eligible commercial customers and qualified end users. This provides an independent ground for us to reject OMAEG's third proposition of law.

### D. Proposition of law No. IV: Whether the commission violated Ohio law by including the Commercial Activity Tax in Rider SGF

{¶ 43} OMAEG argues that the commission erred when it determined that customers must also pay the commercial activity tax ("CAT") through Rider SGF. OMAEG maintains that there is no language in R.C. 3706.46 that allows the commission to gross up, i.e., adjust upward, the monthly Rider SGF charge to account for the CAT. OMAEG alternatively asserts that even if the statute is ambiguous on this point, customers should not be required to pay the CAT, because Rider SGF merely collects subsidies to support private solar-energy generators and does not recover costs for any goods or services provided to customers by the electric-distribution utilities.

**{¶ 44}** In response, the commission asserts that OMAEG fundamentally misunderstands how the commission's order treats the CAT. The commission denies that the order grosses up the revenue in Rider SGF to account for the CAT. According to the commission, the order follows R.C. 3706.46 in setting the amount of annual revenue from Rider SGF at $20 million and expressly disallows any adjustment to the rider to account for the CAT.

**{¶ 45}** For its part, Ohio Power contends that OMAEG unnecessarily challenges the commission's decision regarding the CAT. According to Ohio Power, the Rider SGF funds it collects are not subject to the CAT and, in turn, Ohio Power is not grossing up the amount of Rider SGF to offset its CAT liability and pass it on to customers. Arguing that OMAEG has not raised a valid controversy, Ohio Power urges this court to affirm the commission's CAT determination.

**{¶ 46}** For the reasons explained below, we remand the case to the commission for clarification on this issue.

### 1. Background on the commission's CAT determination

**{¶ 47}** The CAT is levied "on each person with taxable gross receipts for the privilege of doing business in this state." R.C. 5751.02(A). *See also* R.C. 5751.01(A) (defining "person" for purposes of the CAT as including companies "and any other entities"). R.C. 5751.02(A) defines "doing business" as "engaging in any activity, whether legal or illegal, that is conducted for, or results in, gain, profit, or income, at any time during a calendar year." The statute specifies that the CAT is "imposed on the person receiving the gross receipts and is not a tax imposed directly on a purchaser." R.C. 5751.02(A). Likewise, R.C. 5751.02(B) prohibits the CAT from being "billed or invoiced to another person." However, the taxpayer is permitted to recoup its CAT liability by including it in the price it charges for goods or services. R.C. 5751.02(B)(1).

{¶ 48} In the proceedings below, the commission's staff recommended that the CAT be included in the monthly Rider SGF charge to residential and nonresidential customers of the Ohio electric-distribution utilities.

{¶ 49} OMAEG objected to the commission staff's recommendation that customers be responsible for paying the CAT through Rider SGF. OMAEG argued that electric-distribution utilities are responsible for paying the CAT under R.C. 5751.02 and that CAT liability cannot be shifted to customers, because Rider SGF is not recovering costs for any services provided by the utilities. OMAEG also argued that R.C. 3706.46 contains no language that allows electric-distribution utilities to pass the CAT through to its customers.

{¶ 50} Two electric-distribution utilities weighed in as well. Like OMAEG, Ohio Power maintained that the revenues recovered by the electric-distribution utilities through Rider SGF are not subject to the CAT. Conversely, the Dayton Power and Light Company maintained that electric-distribution utilities will be subject to the CAT on revenues collected via Rider SGF and that failing to gross up rider revenues by the amount of the CAT liability will result in electric-distribution utilities incurring CAT costs without offsetting revenue.

{¶ 51} Against this backdrop, the commission made conflicting, or at a minimum confusing, rulings. In one part of its order, the commission expressly determined that "[e]ach [electric-distribution utility] will charge its residential customers $0.10 per month, including CAT." Pub. Util. Comm. No. 21-447-EL-UNC, 2021 WL 3036724, at ¶ 19(a) (July 14, 2021). The commission, however, made no mention in this part of its order whether the nonresidential-customer charge would include the CAT.

{¶ 52} In another part of the order, the commission offered a confusing discussion regarding its authority to adjust the Rider SGF to account for any CAT offset. The commission determined that R.C. 3706.46 required that the solar generation fund be established "without consideration of any CAT adjustment, at

17

an annual amount of $20,000,000." *Id.* at ¶ 14. The commission reasoned that "had the legislature intended to establish the [solar generation fund] at an adjusted amount to account for any CAT offset, it would have expressly done so." *Id.* Accordingly, the commission held that electric-distribution utilities "should collect the fixed amount required by the solar generation fund without regard to any CAT offset." *Id.*

**{¶ 53}** On rehearing, the commission reaffirmed its analysis and clarified:

> Relative to whether CAT amounts are properly included for recovery in Rider SGF, we again reject OMAEG's claimed error. Consistent with our analysis earlier herein, the legislature was aware of our prior statutory interpretation as to this issue, which disfavored reducing rider recoveries to account for any CAT offset, when it enacted H.B. 128. We clarify that the residential customer charge of $0.10 per month is the fixed amount required by the statute without regard to any CAT offset and is not subject to further adjustment. Subject to this clarification, we affirm that the enactment of H.B. 128 without any modification regarding CAT recoveries speaks to the legislative intent as to this issue.

Pub. Util. Comm. No. 21-447-EL-UNC, rehearing entry, 2021 WL 4149861, ¶ 14 (Sept. 8, 2021).

**2. The commission's CAT determination requires clarification**

**{¶ 54}** As we understand the commission's argument in this appeal, it claims that under its order, no CAT amounts are to be included in Rider SGF, because R.C. 3706.46 does not allow the commission to adjust the revenue recovered under the rider to account for the CAT. While the order may be read the way the commission suggests, that is not the only plausible reading.

18

{¶ 55} The commission's order can just as easily be read as holding that the CAT may properly be included in the rider. As noted above, the commission held on rehearing that it lacked authority to *reduce* Rider SGF recoveries to *offset* the CAT. But if the CAT were not included in the monthly rider charge, there would be no reason to determine whether the commission had authority to reduce the rider charge to "offset" the CAT.

{¶ 56} In our view, the commission had the analysis backwards. The commission considered whether it had authority to either gross up or reduce the rider to offset the CAT. What the commission should have asked instead was (1) whether the revenue collected by electric-distribution utilities through Rider SGF was subject to the CAT and (2) if so, whether it was appropriate to shift the CAT liability from electric-distribution utilities onto customers by including CAT amounts in the rider.

{¶ 57} Because the commission's CAT determination can be read two ways, we remand this case to the commission for clarification on this issue. On remand, the commission is instructed to expressly determine whether the revenue recovered by Rider SGF is subject to the CAT and billable to customers.

### E. *Proposition of law No. V: Whether the commission erred in failing to require refund language in the tariffs to Rider SGF*

{¶ 58} OMAEG argues that the commission erred when it failed to require refund language in the tariffs implementing Rider SGF. OMAEG acknowledges that R.C. 3706.55(B) provides for a refund to customers of "any amounts remaining in the [solar generation] fund as of December 31, 2027, minus the remittances that are required to be made between that date and January 21, 2028." But it asserts that the commission should have ordered electric-distribution utilities to include the necessary refund language in the Rider SGF tariffs to effectuate the refund provision contained in R.C. 3706.55(B). According to OMAEG, without refund language in the tariffs, R.C. 4905.32 and the rule against retroactive ratemaking

may prevent customers from receiving refunds they may otherwise be entitled to under R.C. 3706.55(B).

**{¶ 59}** OMAEG overlooks that all Ohio electric-distribution utilities have included language in their Rider SGF tariffs to effectuate the refund and reconciliation processes required by R.C. 3706.46(C) and 3706.55(B). Therefore, OMAEG's argument is moot. *See In re Application of Ohio Edison Co.*, 157 Ohio 73, 2019-Ohio-2401, 131 N.E.3d 906, ¶ 51 (plurality opinion).

## IV. CONCLUSION

**{¶ 60}** For the foregoing reasons, we affirm the commission's order in part, reverse it in part, and remand this case for clarification.

Order affirmed in part

and reversed in part

and cause remanded.

FISCHER, DONNELLY, STEWART, and KILBANE, JJ., concur.

DEWINE, J., concurs in part and dissents in part, with an opinion joined by KENNEDY, J.

MARY EILEEN KILBANE, J., of the Eighth District Court of Appeals, sitting for BRUNNER, J.

––––––––––––––––

**DEWINE, J., concurring in part and dissenting in part.**

**{¶ 61}** The General Assembly set up a fund to subsidize solar power and tasked the Public Utilities Commission of Ohio ("PUCO") with establishing the amounts that ratepayers must pay into the fund. In doing so, the General Assembly placed caps on the amounts that could be assessed "per customer." PUCO, though, decided that when the General Assembly said "per customer," it didn't really mean it. It held that the "per-customer" cap does not actually cap the amount that may be charged to each customer. Instead, it determined that the "per-customer" cap

limits the amount that may be billed to an account. So, under its order, a single customer with multiple accounts may be assessed the "per-customer monthly" cap amount multiple times.

{¶ 62} PUCO's interpretation is contrary to the ordinary meaning of the word "customer." It is also at odds with the definition of "customer" contained in the Ohio Administrative Code. The construction of a statutory term is a pure question of law over which this court has independent power of review. Yet the majority signs off on the commission's contra-textual interpretation without any analysis of the statutory language at all. Thus, I respectfully dissent from that portion of the majority's judgment. I concur in the rest of its judgment.

### I. The General Assembly Establishes a Per-Customer Cap

{¶ 63} In tasking PUCO with setting the solar fund rider ("Rider SGF"), the General Assembly placed limits on the amount that a customer could be billed. R.C. 3706.46(B) provides:

> In authorizing the level and structure of any charge to be billed and collected by each electric distribution utility, the commission shall ensure that *the per-customer monthly charge* for residential customers does not exceed ten cents and that *the per-customer monthly charge* for industrial customers eligible to become self-assessing purchasers * * * does not exceed two hundred forty-two dollars.

(Emphasis added.)

{¶ 64} The issue here concerns the application of these per-customer caps. In establishing Rider SGF, PUCO found that the "legislative use of the word 'customer' in R.C. 3706.46(B) is clear and unambiguous" and requires that the cap be applied "in connection with each billing account established in accordance with

the applicable contract or tariff." Pub. Util. Comm. No. 21-447-EL-UNC, 2021 WL 3036724, ¶ 16 (July 14, 2021). The Ohio Manufacturers' Association Energy Group ("the OMA") challenges PUCO's holding that "customer" doesn't mean customer but, rather, means account. It complains that because of PUCO's ruling, customers who have multiple accounts and meters and customers with multiple facilities are being forced to pay up to the capped amount for each account.

**{¶ 65}** In support, the OMA points to the ordinary meaning of the word "customer." It contends that the meaning of "customer" is unambiguous, but it suggests that if the court finds the term to be ambiguous, it should look at legislative history. In this vein, it points out that earlier versions of the legislation contained a "per account" cap but the legislature replaced that language with a "per customer" cap.

## II. The Majority's Flawed Analysis

**{¶ 66}** The majority never takes on the plain-reading argument. (And who can blame it—it's pretty hard to argue that "customer" doesn't mean customer.) Instead, it comes up with a convoluted rationale for just ignoring plain meaning. That rationale goes like this:

1.   When a term has a technical meaning, we should apply that meaning rather than the term's plain meaning.

2.   We presume PUCO orders to be reasonable, and the OMA must overcome that presumption.

3.   PUCO said it relied on the definition of "customer" in Ohio Adm.Code 4901:1-10-01(I) as establishing that the technical meaning of "customer" is account. The OMA failed to challenge PUCO's application of the administrative code's definition of "customer." And "[t]his defeats [OMA's] argument that the commission violated R.C. 3706.46(B) in applying Rider SGF on a per-account basis." Majority opinion, ¶ 29.

What a load of tautological nonsense. Let's start at the top.

### A. Technical meaning

{¶ 67} It is true that sometimes the context in which words are used can demonstrate that a technical meaning is intended rather than an ordinary meaning. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012); *see also* R.C. 1.42 ("[w]ords and phrases that have acquired a technical or particular meaning * * * shall be construed accordingly"). But nothing here demonstrates that the legislature was using "customer" in any way other than its ordinary meaning of "one that purchases some commodity or service," *Webster's Third New International Dictionary* 559 (2002). Moreover, as explained below, the majority fails to identify any technical meaning of "customer" applicable here that is different from the word's ordinary meaning. Instead of simply assuming that a technical meaning exists for "customer" and that it is controlling, the majority should have asked (1) is there a technical meaning of "customer" that is different from the word's ordinary meaning and, if so, (2) does context demand that the technical meaning control over the ordinary meaning?

### B. Presumption

{¶ 68} Next, the majority repeats the shibboleth that "[w]e presume commission orders to be reasonable," majority opinion at ¶ 28. This "presumption" goes back to *E. Ohio Gas Co. v. Pub. Util. Comm.*, where this court stated that the presumption existed specifically with respect to whether the commission's "findings and orders are just and reasonable," 137 Ohio St. 225, 249, 28 N.E.2d 599 (1940). But the presumption applies only to factual questions—the types of questions that require us to look at the record and determine whether the evidence supports the commission's decision on a matter. *See id.* at 248-249; *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.*, 68 Ohio St.3d 559, 563, 629 N.E.2d 423 (1994) (distinguishing between factual questions, to which the presumption applies, and questions of law).

**{¶ 69}** This court has "complete and independent power of review" when it comes to questions of law in appeals from the commission. *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997). The meaning of the word "customer" in a statute is purely a question of law. And as a simple question of the legal interpretation of a commonly used term, it is one that we answer without deference to PUCO. *See In re Application of Ohio Edison Co.*, 157 Ohio St.3d 73, 2019-Ohio-2401, 131 N.E.3d 906, ¶ 62-63 (DeWine, J., concurring in judgment only); *In re Application of Black Fork Wind Energy, L.L.C.*, 156 Ohio St.3d 181, 2018-Ohio-5206, 124 N.E.3d 787, ¶ 43 (Kennedy, J., concurring). Indeed, since the days of *Marbury v. Madison*, it has been clear that it is for judges, not bureaucrats, to say what the law is. 5 U.S. 137, 2 L.Ed. 60 (1803).

### C. Not Challenged

**{¶ 70}** The majority saves its best trick for last. It says PUCO relied on the definition of "customer" in the Ohio Administrative Code as establishing the technical meaning of "customer" and the OMA never challenged PUCO's reliance on that definition until its reply brief, so, voila, PUCO wins. Almost magically, PUCO carries the day without the court even having to look at whether the legislature meant to ascribe a technical meaning to "customer" different from the ordinary meaning or even examining the technical meaning applied by PUCO.

**{¶ 71}** The problem is that the OMA *did* challenge PUCO's understanding of the word "customer" in its opening brief. It argued that based on the plain language of R.C. 3706.46(B), as well as the statute's legislative history, the ordinary meaning of "customer" applied. As it explained, "The plain language of R.C. 3706.46(B) (Appx. 66) unequivocally directed the PUCO to implement the Rider SGF monthly cost caps on a per-customer basis. The PUCO cannot lawfully construe the meaning of 'per-customer' to mean 'per-billing account.' "

**{¶ 72}** The majority seems to think that the OMA had some obligation in its initial brief to specifically debunk PUCO's contention that the administrative-

code provision supported PUCO's reading of the statute. It didn't. The OMA's argument was much more basic: there was no need to consider the administrative-code provision because the language of the statute is clear. The majority should have assessed the OMA's argument and decided whether to apply the plain language of the statute or whether context demanded that a different technical meaning of "customer" be applied. Instead, it threw together an unwarranted assumption, a legally incorrect presumption, and a mischaracterization of the OMA's argument to completely avoid any textual analysis of the statute.

### III. The Administrative-Code Provision Doesn't Support
### PUCO's Reading of the Statute

{¶ 73} So let us do what the majority refuses to do: answer the proposition of law in front of us and determine whether PUCO properly held that as used in R.C. 3706.46(B), "customer" really means "account."

{¶ 74} There is no good-faith argument that the ordinary meaning of "customer" is anything other than what the OMA says it is—a person or entity who contracts for utility services. The only question is whether there is a technical meaning of "customer" different from its ordinary meaning that should be applied in this context.

{¶ 75} PUCO does not set forth any argument that the legislature meant the word "customer" in anything but the ordinary sense of the word. It simply points to the existence of an administrative provision, Ohio Adm.Code 4901:1-10-01(I), which PUCO itself promulgated, and asks this court to defer to its reading of the provision.

{¶ 76} But turn to that definition. A "customer" is "any person who has an agreement, by contract and/or tariff with an electric utility * * * to receive service." *Id*. "Person" means "an individual, corporation, business trust, estate, trust, partnership, and association." Ohio Adm.Code 4901:1-10-01(Y); R.C. 4928.01(A)(24); R.C. 1.59(C). Any plain reading of the definition is fatal to

PUCO's argument that "customer" means "account." Under the definition, a "customer" is simply a person or entity that has an agreement to receive service. Nothing in the definition suggests that one customer cannot have multiple agreements or have multiple accounts. So even if we do what PUCO asks and look to the administrative-code definition, we end up exactly where we started. "Customer" means customer; it doesn't mean account.

**{¶ 77}** Tellingly, despite saying that the administrative-code provision controls, PUCO does not make any argument about the actual language of the administrative-code provision. Instead, it points to its own caselaw interpreting that administrative-code provision. PUCO brief at 8-9, citing *In re Establishing the Nonbypassable Recovery Mechanism for Net Legacy Generation Resource Costs Pursuant to R.C. 4928.148*, Pub. Util. Comm. No. 19-1808-EL-UNC, ¶ 27 (Nov. 21, 2019). In essence, it reasons: *the administrative-code provision means what we say it means because that is what we have said.*

**{¶ 78}** But of course, it's up to the legislature, not PUCO, to make the law. And it's up to this court to say what the law is. The fact that PUCO may have gotten the law wrong in the past does not grant it license to do so in the future.

**{¶ 79}** Here, both the plain language of the statute and the plain language of the administrative-code provision relied upon by PUCO point in the same direction: "customer" means customer. And because the statute is unambiguous, there is no need take up the OMA's legislative-history argument.

### IV. Conclusion

**{¶ 80}** Because neither ordinary meaning nor the administrative code support the commission's interpretation of "per-customer" in R.C. 3706.46(B), I dissent from the majority's judgment affirming PUCO's order on proposition of law No. II. I would remand the case to PUCO to apply the Rider SGF on a per-customer basis as dictated by the statute. I concur in the remainder of the majority's judgment.

KENNEDY, J., concurs in the foregoing opinion.

—————————

Carpenter Lipps & Leland, L.L.P., Kimberly W. Bojko, Jonathan Wygonski, and Thomas V. Donadio, for appellant.

Dave Yost, Attorney General, and John H. Jones, Jodi J. Bair, and Thomas M. Shepherd, Assistant Attorneys General, for appellee.

Steven T. Nourse, for intervening appellee.

—————————